THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TERESA M. GAFFNEY,
SARAH K. SUSSMAN, individually and as
Trustee of the Sussman Family Trust,

          Plaintiffs,

v.                                    Case No.: 8:2021 CV 000021

JUDGE PAUL L. HUEY,
JUDGE REX M. BARBAS,                       Judge Charlene Honeywell
JUDGE CAROLINE TESCHE ARKIN,
PHILLIP A. BAUMANN, P.A.,
a/k/a BAUMANNKANGAS, P.A.,
PHILLIP A. BAUMANN,
MICHAEL R. KANGAS,
JASON G. GORDILLO,
agent of Hillsboro+ugh County,
DEPUTY JONATHAN CARLTON,
CORPORAL GARY HARRIS,
CHIEF JUDGE RONALD FICARROTTA,
HILLSBOROUGH COUNTY, a municipality,
SHERIFF CHAD CHRONISTER,
HILLSBOROUGH COUNTY
SHERIFFS OFFICE,

          Defendants.

PLAINTIFFS' RESPONSE IN OPPOSITION TO
SHERIFF AND COUNTY DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs, Teresa M. Gaffney, Sarah K. Sussman, and Sarah K. Sussman, as

trustee of the Sussman Family Trust, (hereinafter referenced as the, "Plaintiffs"),

by and through their undersigned counsel, (1) file this, their opposition to the Rule

12(b)(1) motion filed on behalf of the Defendants  and  (2) request that this Court

deny the Rule 12(b)(6) Motion filed on behalf of the Defendants, and, states as

follows:

1.    In Counts I, II, III, VI, Plaintiffs' claims at bar are claims pursuant to

42 U.S.C. §§1983 and 1985 that "Defendants conspired and acted under color of

state law to deprive Plaintiffs of their Fourteenth Amendment right to due process

of law."

2.    Defendants, JASON G. GORDILLO, agent of Hillsborough

County,DEPUTY JONATHAN CARLTON, CORPORAL GARY HARRIS,

HILLSBOROUGH COUNTY, a municipality, SHERIFF CHAD CHRONISTER

filed a Motion to Dismiss under Fed. R. Civ. P. Rules 12(b)(1) and 12(b)(6)

through which they claim that Plaintiffs' Amended Complaint should be dismissed

with prejudice because:

(1)  Res Judicata; (2) Rooker-Feldman Doctrine; (3) Younger Abstention;

(4) Absolute Quasi Judicial Immunity; (5) Qualified Immunity; (6) Good

Faith Immunity; (7) Failure to State a Claim; and (8) Untimely Service.

## STANDARD

3.    The plausibility standard under Rules 8(a) and 12(b)(6) plainly "does

not impose a probability requirement at the pleading stage." *Twombly* , 550 U.S. at

556, 127 S.Ct. 1955. Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Id*. ; see also *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ["The plausibility standard is not akin to a probability requirement...." (citation and internal quotation marks omitted)].  See, *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1350 (11th Cir. 2018).

## STANDARD OF REVIEW

4.    On a motion to dismiss for failure to state a claim, the allegations in the complaint must be accepted as true and construed in the light most favorable to the plaintiff.  *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016). It is well established that "[a] complaint must not be dismissed unless it is shown that plaintiff can prove no set of facts in support of this claim, which would entitle him to relief." *Jackam v. Hosp. Corp. of Am. Mideast*, 800 F.2d 1577, 1579 (11th Cir. 1986).

5.    To survive a motion to dismiss, a pleading must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) [quoting Fed. R. Civ. P. 8(a)(2)].  Labels, conclusions and formulaic recitations of the elements of a cause of action are not sufficient. *Id*. [citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)].

6.     Furthermore, mere naked assertions are not sufficient. *Id*. A complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is plausible on its face." *Id*. (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted).

7.     The court, however, is not bound to accept as true a legal conclusion stated as a "factual allegation" in the complaint. *Id*.

8.     Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555, [quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)]. Such a statement "does not need detailed factual allegations." *Id.* (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. at 678, (quoting *Twombly*, 550 U.S. at 570).

9.     A well-pleaded complaint may proceed even if it appears "that actual proof of those facts is improbable, and that a recovery is very remote and

4

unlikely." *Twombly*, 550 U.S. at 556 (citation omitted).  The court assumes the truth of Plaintiffs' factual allegations and construes the facts, and any reasonable inferences, in the light most favorable to Plaintiff.  *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) and *Lavalais v. Vill. of Melrose Park* , 734 F.3d 629, 632 (7th Cir. 2013).

10.    With respect to § 1983 cases that involve individuals entitled to assert qualified immunity, the Eleventh Circuit imposes "heightened pleading requirements." *Swann v. Southern Health Partners, Inc.*,388 F.3d 834, 836-838 (11th Cir. 2004) (citing *Leatherman v. Tarrant County*,507 U.S. 163 (1993)); *Laurie v. Ala. Court of Crim. Appeals*, 256 F.3d 1266, 1275-76 (11th Cir. 2001).

11.    A complaint should not be dismissed for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The Federal Rules of Civil Procedure "do not require a claimant to set out in detail the facts upon which he bases his claim." *Id*. at 47. All that is required is "a short and plain statement of the claim." Fed.R.Civ.P. 8(a)(2).

12.    The standard on a 12(b)(6) motion is not whether the plaintiff will ultimately prevail in his or her theories, but whether the allegations are sufficient

to allow the plaintiff to conduct discovery in an attempt to prove the allegations. See *Jackam v. Hospital Corp. of Am. Mideast, Ltd.*, 800 F.2d 1577, 1579 (11th Cir. 1986).

13.    The Federal Rules of Civil Procedure have adopted this "simplified pleading" approach because of "the liberal opportunity for discovery and other pretrial procedures . . . to disclose more precisely the basis of both claim and defense."*Conley*, 355 U.S. at 48.

## APPLICABLE LAW

14.    Section 1983 imposes liability on one who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To establish a claim under § 1983, plaintiff must prove that: (1) defendant deprived him of a right secured under the Constitution or federal law, and (2) such deprivation occurred under color of state law. *Arrington v. Cobb County*,139 F.3d 865, 872 (11th Cir. 1998); *U.S. Steel, LLC v. Tieco, Inc.*,261 F.3d 1275, 1288 (11th Cir. 2001).

15.    Officials cannot be held liable pursuant to § 1983 solely on the basis of respondeat superior or vicarious liability. *Bryant v. Jones*, 575 F.3d 1281, 1299 (11th Cir. 2009) (citations omitted). Instead, supervisory defendants can only be liable if they participate in the violation or if their actions caused the violation.

*Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003). A causal connection can be established: (1) when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so; (2) when the supervisor's improper custom or policy resulted in deliberate indifference to constitutional rights; or (3) when the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so. *Id*. at 1234-35.  See also, *Nelson v. Gualtieri*, Case No: 8:19-cv-449-T-36JSS, at *6 (M.D. Fla. Nov. 23, 2020).

## ARGUMENTS

### I.   RULE 12(b)(1)

16.    The Court lacks subject matter jurisdiction over the Plaintiffs' claims pursuant to the Res Judicata, Rooker-Feldman Doctrine and the Younger Doctrine, both of which bar federal review of state court proceedings.

17.    It is well established "that for the doctrine of res judicata to apply, several conditions must exist, which include: `identity of the thing sued for; identity of the cause of action; identity of [the] parties; and identity of the quality in the person for or against whom the claim is made. `" *United Automobile v. Law Offices*, 46 So. 3d 1101, 1104 (Fla. Dist. Ct. App. 2010), citing, *Dadeland Depot, Inc. v. St. Paul Fire Marine Ins. Co*., 945 So.2d 1216, 1235 (Fla. 2006) [quoting

7

*Albrecht v. State*, 444 So.2d 8, 12 (Fla. 1984)].

18.     The present case is not appropriate for the application of res judicata, as neither the parties nor the cause of action are the same." " *United Automobile v. Law Offices*, 46 So. 3d 1101, 1104 (Fla. Dist. Ct. App. 2010).

19.     In the prior actions, Plaintiffs litigated the lawsuit against the Estate of John Gaffney. Presently, Plaintiffs bring a separate lawsuit against the attorneys, judges, Hillsborough County and its officers and agent and allege fraud and conspiracy.

20.     The allegations of fraud and conspiracy have never been adjudicated against the current parties and the mere reference to a prior controversy is insufficient to raise the res judicata issue. *McLean v. McLean*, 461 So.2d 1031, 1033 (Fla. 2d DCA 1985).  The issues of fraud and conspiracy separate and distinct issues from those adjudicated.

21.     Further, in the case at bar, Plaintiffs have provided supporting facts to prove fraud and conspiracy and have not just alleged conclusions. Plaintiffs' proof of fraud and an unlawful conspiracy between Defendants, Phillip A. Baumann, Michael R. Kangas, Jason G. Gordillo, Deputy Jonathan Carlton, Corporal Gary Harris, are provided by the attached affidavits to the Second Amended Complaint, and, are present against the Hillsborough County and its officers and Jason

Gordillo, its agent.

22.     In the case at bar, an order of default and sanctions was entered against Plaintiffs on September 6, 2017, in case # 2014 CA 3762.  See Def. Exh. "E."  On October 16, 2017, a judgment was issued and the judgment could not be final judgment until ten days thereafter to give the Plaintiffs a chance to file a Notioce of Appeal and to request a stay.

23.     On October 17, 2017, the Hillsborough County Clerk issued a "Writ of Possession." Def. Exh. "G."  On October 18, 2017, Plaintiff, Sarah Sussman filed a notice of homestead and bankruptcy. See attached Homestead which marked Plaintiffs' Exhibit "B."

24.     On October 23, 2017, Defendant, Jason Gordillo, received a call from Civil Process Division and asked for his professional opinion as whether the Sheriffs could execute Writ of Possession.  See Gordillo Dep Tr, p. 49, attached and marked Plaintiffs' Exhibit "A."

25.     On October 24, 2017, Defendant, Jason Gordillo, did some research and he reviewed the Default Order entered on September 6, 2017; Sarah Sussman's bankruptcy filing and the Writ of Possession.  See Gordillo Dep Tr, pp. 50, 89, 90, 94, 97, attached and marked Plaintiffs' Exhibit "A." Defendant, Jason Gordillo, was too much in a hurry to find some basis to execute the Order of

9

Possession as he and Defendant, Michael R. Kangas, were going to fulfill their conspiracy to take Plaintiffs' real property away, and thus, October 24, 2017, Defendant, Jason Gordillo, advised Defendants, Deputy Jonathan Carlton and Corporal Gary Harris, that they could execute the Writ of Possession" which they did on October 25, 2017.

26.    On October 26, 2017, final judgment was issued.  (Emphasis added tothe fact that the Writ of Possession was executed before there was a final judgment issued).  Defendant, Jason Gordillo admitted that he never research whether Hillsborough County needed a Final Judgment before it executed the Writ of Possession and took Plaintiff's homestead, real property.  Gordillo Dep Tr, p. 89, attached and marked Plaintiffs' Exhibit "A."

27.    This alone is a denial of due process and reasonable proof of a conspiracy to take Plaintiffs' real property without allowing due process.  This is overwhelming proof of fraud on the court and a knowing and intentional breach of the Plaintiffs' Constitutional rights to Due Process and the unlawful taking of Plaintiffs' real property and substantial proof of the allegations and losses alleged in Counts I, II, III, VI, VII and VIII.

28.    These facts, and the inferences therefrom, provide clear and convincing proof that Defendants, Jason G. Gordillo, Agent of Hillsborough

County, Deputy Jonathan Carlton, Corporal Gary Harris, employees of

Hillsborough County, and Sheriff Chad Chronister, unlawfully executed the Writ

of Possession was filed on October 17, 2017.

29.    Defendant, Jason Gordillo's, action at bar were knowing and

intentional violation of the Florida Constitution, Article X, Section 4 which

prohibited the October 25, 2017, execution of the Writ of Possession.

The homestead guarantee uses broad language protecting the homestead from

involuntary divestiture by the courts.

30.    As for the nature of what is "plausible," the Supreme Court explained

that "[a] claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for

the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. at 1949.

31.    The Defendants invoke the Rooker-Feldman doctrine, which

precludes federal courts (other than the Supreme Court) from exercising

subject-matter jurisdiction over claims brought by parties that seek review or

modification of final state-court judgments. See *Rooker v. Fidelity Trust Co.*, 263

U.S. 413, 415-16 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 482-86

(1983).

32.    There are at least two exceptions to application of the

Rooker-Feldman doctrine that likely preserve this Court's subject-matter jurisdiction: there may not be a final order and, if there is, the complaint alleges that it was the product of corruption of the state judicial process. " A district court may look to evidence outside of the pleadings when resolving a motion to dismiss for lack of subject-matter jurisdiction. " *Dinsio v. Appellate Div.*, 1:16-CV-0324 (GTS/CFH), at \*18 (N.D.N.Y. July 14, 2017).

33.    In the case at bar, even if the Judgments entered on September 6, 2017, and October 26, 2017, constitute final orders, Plaintiffs do not ask this court to review or modify those orders.  Plaintiffs' alleged injuries stems not from the state court orders but from the alleged conspiracy. And to the extent that Plaintiffs' claims do ask this court to review the orders and apply Florida law to determine damages, Plaintiffs' claims fall under the corruption exception and are not barred. Rooker-Feldman cannot apply to the case at hand. The claims asserted by the Plaintiffs, in the case at hand are independent to the state court matter; the state court matter is not concluded. Temporality forecloses the applicability of the *Rooker-Feldman* doctrine.

34.    In the case at bar, the Second Amended Complaint is based on allegations of public corruption and on a federal question whether the Defendants, through public corruption, conspired to violate Plaintiffs' Constitutional Rights.

35.     The Seventh Circuit has held that "[t]he claim that a defendant in a civil rights suit 'so far succeeded in corrupting the state judicial process as to obtain a favorable judgment' is not barred by the *Rooker-Feldman doctrine*." Loubser v. Thacker, 440 F.3d 439, 441 (7th Cir. 2006) (quoting Nesses v. Shepard, 68 F.3d 1003, 1005 (7th Cir. 1995)). That is precisely the claim at bar.

36.     Next, Defendants claim that Abstention bars Plaintiffs' claims.  The Supreme  Court held in *Younger v. Harris*, 401 U.S. 37 (1971), that federal district courts must abstain from addressing constitutional claims that might interfere with ongoing state court proceedings. That doctrine applies in "three limited categories of cases, . . . where federal court intervention would intrude into ongoing state criminal proceedings, into state-initiated civil enforcement proceedings akin to criminal prosecutions, or into civil proceedings implicating a state's interest in enforcing orders and judgments of its courts."

37.     The underlying proceeding here, a "dead on arrival" attempt to recover real property fraudulently transferred from an estate, does not fit in any of the three categories. *Id*. (holding that the underlying divorce proceeding did not fit within any of the categories) [citing *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72-73 (2013)]. Assuming that the state proceedings are ongoing, the Younger abstention doctrine does not require abstention in this case.

13

38.     In *Sprint Communications, Inc., Jacobs,* 134 S. Ct 584 (2013), a case

arising in the Eighth Circuit, the U.S. Supreme Court emphasized that federal

courts may abstain from hearing a matter in only three categories of cases.

Abstention is appropriate in cases involving "state criminal proceedings, civil

enforcement proceedings and civil proceedings involving certain orders that are

uniquely in furtherance of the state courts' ability to perform their judicial

functions".

39.     In *Sprint, supra*, the U.S. Supreme Court, in a strongly worded

decision explained that federal courts have a virtually unflagging obligation to

hear cases within their jurisdiction. The unanimous ruling emphasizes that

abstention pursuant to *Younger v. Harris,* 401 U.S. 37 (1971) is not appropriate

merely because a state court is considering a case involving the same subject

matter.

40.     The Supreme Court concluded that none of the exceptions applied to

the *Sprint* case. The Supreme Court noted that the proceedings were not criminal

and did not impact on the Iowa state court's ability to perform its functions. The

lower courts erred in applying the *Younger Doctrine.*

41.     In the view of the Supreme Court, the Eighth Circuit attached too

much importance to the three factors discussed in *Middlesex County Ethics Comm.*

14

*V. Garden State Bar Ass'n,* 457 U.S.423 (1982)*.* The Supreme Court explained that these factors are not dispositive.

42.     Laura J. McLaughlin, Chesterfield, Missouri, cochair of the ABA section of Litigation's Commercial & Business Litigation Committee noted that the Supreme Court has made a "really strong statement" that federal courts may avail themselves of the *Younger Doctrine* only in exceptional circumstances.

43.     According to Stephen J. Siegel, Chicago, Illinois, cochair of the Section of Litigation's Commercial & Business Litigation Committee, the Supreme Court has now taken steps to prevent an open-ended standard from being applied to abstention.

44.     Thus, although the federal government may be anxious "to vindicate and protect federal rights and federal interests . . . [it must] do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger*, 401 U.S. at 44. In the case at bar, Plaintiffs filed an action under 42 U.S.C. §1983, and sought Constitutional relief against local state Circuit Court public corruption and is not asking the United States District Court to interfere with "legitimate activities of the State of Illinois" as public corruption is not legitimate activities.

44.     The three factors set forth by the Supreme Court in *Sprint, supra*, are manifestly not present in the instant claim put forth by the Plaintiffs. The claim(s)

15

set forth in the Plaintiffs complaint are not subject to state court criminal

adjudication; are not civil enforcement proceedings and are not civil proceedings

involving certain orders that are uniquely in furtherance of the state courts' ability

to perform their judicial functions.

45. The *Younger Doctrine* is inapplicable under the reasoning in *Sprint,*

*supra*, and the facts set forth in the complaint filed by Plaintiffs in this matter and

in this opposition to the Rule 12(b)(6) motion filed by the Defendants.

46. *Loubser v. Thacker*, 440 F.3d 439 (7th Cir. 2006) provides a

meaningful example that is similar to case at bar.  In *Loubser*, "the complaint

charged that over a three-year period beginning in August of 2001, state judges

and court reporters, Loubser's own lawyers, her former husband, building

contractors, the owner of a jewelry store, and numerous friends and relatives of the

other conspirators, conspired to destroy her financially and drive her out of the

country by manipulating the divorce proceedings to deny her due process of law,

and that they did all this because they consider her a 'fucking South African Bitch

who makes too much Fucking Money' as a physical therapist.'" *Loubser v.*

*Thacker*, 440 F.3d 439, 441 (7th Cir. 2006).

47. In *Loubser*, the Plaintiff also claimed that one of the defendants

destroyed title documents essential to her divorce proceedings; two of the

16

defendants effaced all records of the existence of a related case; her own lawyers, along with court reporters, altered transcripts; her lawyers refused to present crucial evidence; the judge presiding over the divorce proceeding consorted improperly with Loubser's ex-husband and a number of his witnesses, one of whom touched the judge and "rubbed his belly." *Id.*

48.    Judge Posner wrote the opinion in *Loubser* and the Seventh Circuit Court of Appeals held, "[t]he claim that a defendant in a [federal] civil rights suit so far succeeded in corrupting the state judicial process as to obtain a favorable judgment is not barred by the Rooker-Feldman doctrine." *Id*. at 441, citing, *Nesses v. Shepard*, 68 F.3d 1003, 1005 (7th Cir.1995).

49.    This ruling provides support to the claim that Federal cases seeking damages for Constitutional violations suffered a s a result of "corrupt state judicial process" should never be exposed to potential dismissal because of Fed. R. Civ. P. Rule 12(b)(1) motions to dismiss because of lack of subject matter jurisdiction. Thus, the case at bar must not be dismissed by abstention.

## II.   IMMUNITY

### a. Absolute Immunity

The Eleventh Amendment bars claims by an individual "against one of the United States." U.S. Const. amend. XI. The Supreme Court additionally has held

that the Eleventh Amendment does not preclude suits against local governments in federal court. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280-81, 97 S.Ct. 568, 572-73, 50 L.Ed.2d 471 (1977); *Gamble v. Florida Dept. of Health Rehabilitative Servs.*,779 F.2d 1509, 1512-13 (11th Cir. 1986). This court specifically has recognized that the Eleventh Amendment does not prevent an award of damages against a county. *Lundgren v. McDaniel*,814 F.2d 600, 605 n. 4 (11th Cir. 1987).

In section 1983 actions, this court has determined that Florida sheriffs are county officials as opposed to state officials. *Hufford v. Rodgers*,912 F.2d 1338, 1341-42 (11th Cir. 1990); *Lundgren*,814 F.2d at 605 n. 4; see also *Bailey v. Wictzack*,735 F. Supp. 1016, 1019 (M.D.Fla. 1990) ("[U]nder Florida's constitutional scheme, a county has an existence independent of the state and the sheriff is a county rather than a state official.").

The Defendants, in their official capacity, are officials of Hillsborough County and there is no allegation that the state would pay any judgment.  Absolute immunity must be denied.

### b.  Qualified or Good Faith Immunity

The Supreme Court has held "that government officials performing discretionary functions generally are shielded from liability for civil damages

18

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L. Ed.2d 396 (1982). "Instead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job responsibilities." *Holloman ex Rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).  As such, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*,475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

To assess their qualified immunity defense, the Court must examine whether the Sheriff's Defendants can establish that they were performing discretionary functions, and, if so, whether plaintiffs can show that the Sheriff's Defendants' conduct violated clearly established rights of which a reasonable person would have known.  Plaintiffs believe that the Defendants may be able to establish they were performing discretionary functions, but, the evidence shows that the Defendants violated Plaintiffs' clearly established Constitutional Right to own a home, real property without interference under color of law.

The rule is that once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the

official is not entitled to qualified immunity." *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004); *Holloman ex Rel. Holloman v. Harland*, 370 F.3d at 1267 (to satisfy its burden, plaintiff must demonstrate that reasonable jury could interpret record evidence as showing that defendant violated a clearly established constitutional right). In this context, courts examine whether the defendant's conduct "violated a clearly established constitutional right" of which a "reasonable government official would have been aware." *Chesser v. Sparks*, 248 F.3d 1117, 1122 (11th Cir. 2001); see also *Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) (official performing discretionary function is barred from qualified immunity if evidence in light most favorable to plaintiff shows that official's conduct violated clearly established constitutional right). To resolve this issue, a court must first ask whether, taken in the light most favorable to the plaintiff, the evidence shows that the official's conduct violated a constitutional right. See, *Harris v. Coweta County*, 433 F.3d 807, 811 (11th Cir. 2005). If that question is answered negatively, then the analysis ends and qualified immunity applies. *Id*. If, however, the question is answered affirmatively, then the court reaches the follow-up query of "whether, at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law." *Id*. An affirmative answer to this question precludes qualified immunity, while a negative

answer clinches qualified immunity.

Plaintiffs restate what is applicable in the case at bar, especially in the light most favorable to Plaintiff: "As such, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Malley v. Briggs*,475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).  The Defendants at bar knowingly violated the law.

Florida case law is clear.  The constitutional protection of homesteads has not changed since the discussion in *Caggiano* to include forfeiture as one of the enumerated exceptions. In the absence of such a provision, any court cannot judicially create one.  See, *Havoco of America v. Hill*, 790 So. 2d 1018, 1022 (Fla. 2001), citing, *Tramel v. Stewart*, 697 So. 2d 821, 824 (Fla. 1997).

In *Butterworth v. Caggiano*, 605 So.2d 56 (Fla. 1992), the State sought civil forfeiture of Caggiano's residence following Caggiano's conviction on one count of racketeering in violation of the Florida Racketeer Influenced and Corrupt Organization Act and fifteen counts of bookmaking. The State sought forfeiture of Caggiano's homestead on the grounds that the property was used by Caggiano in the course of racketeering activity. *Id*.

The Court, in rejecting the State's attempted distinction between forfeitures and the constitution's reference to "forced sale[s]," held that article X, section 4 (of the Florida Constitution) prohibited the forfeiture of Caggiano's homestead:

21

> Consequently, in light of the historical prejudice against forfeiture, the
>
> constitutional sanctity of the home, and the rules of construction requiring a
>
> liberal, nontechnical interpretation of the homestead exemption and a strict
>
> construction of the exceptions to that exemption , we hold that article X,
>
> section 4 of the Florida Constitution prohibits civil or criminal forfeiture of
>
> homestead property.

*Id*. at 61.

The homestead guarantee uses broad language protecting the homestead from involuntary divestiture by the courts. Havoco of America v. Hill, 790 So. 2d 1018, 1022 (Fla. 2001), citing, *Tramel v. Stewart*, 697 So. 2d 821, 824 (Fla. 1997).

Overlaid upon this granular analysis is an overarching public policy that strongly favors preservation of the family dwelling place. *In re Ehnle* , 124 B.R. 361, 363 (Bankr. M.D. Fla. 1991). In keeping with the strong preference of providing a safety net to a debtor's family unit, the party objecting to the claim of homestead status has the burden of showing that the claimant is not entitled to it. *Id*. ("The claim of exemptions carries initially some presumptive validity and it is clear that the burden is on the objecting party to establish with [a] preponderance of the evidence that Debtor in fact is not entitled to the exemptions claimed.").

For this reason, any analysis of abandonment of a property claimed as homestead must consider "all of the pertinent facts and circumstances of each

individual case." *In re Martinez,* 595 B.R. 912, 920 (Bankr. S.D. Fla. 2019),

citing, *Marsh v. Hartley* , 109 So.2d 34, 38 (Fla. 2d DCA 1959) (internal citations

omitted).

In practice, courts typically view these two requirements as comprising two

independent, yet equally important, tests. *In re Martinez,* 595 B.R. at 919.  The

first test is subjective and looks to the perceived intent of the claimant to reside

permanently in the subject property as evidenced through the claimant's actions.

*Id*.  Because intent is often difficult to prove through testimonial evidence (and

such testimony may be unavoidably self-serving, as Debtor's was in this

Bankruptcy Case), courts often look to documentary evidence in the form of

driver's license registration, voting registration, mail delivery, and other similar

discrete indicators of continued intent to reside at the property claimed as

homestead. See, e.g. , *In re Lloyd* , 394 B.R. 605, 610-12 (Bankr. S.D. Fla. 2008).

By contrast, the second test, proof of actual residence, generally follows a

more straight-forward analysis. See, e.g. , *Lanier v. Lanier* , 95 Fla. 522, 116 So.

867, 868 (1928) (discussing historical status of subject property as the homestead).

Although reference to the same extrinsic markers may be mandated in a handful of

unusual situations, typically proof of actual residence can be shown through

habitation at the property for a significant period. See *id. C.f. Wiley* , 570 B.R. at

668-73 (considering extrinsic indicators of residence and determining debtors' use

of property was as a secondary, rather than primary, place of abode).

In the case at bar, Sarah Sussman's driver's license registration, voting registration, mail delivery were registered to the Clark Street Real Property and the Clark Street Property was the residential address of Plaintiff, Teresa M. Gaffney, and her spouse Dov Sussman, now deceased.

There is absolutely no doubt that the Defendants did everything possible to determine that homestead did not apply and that immediate execution of the Writ of Possession served their conspiracy.  No evidentiary hearing was ever provided and the decision was made by Defendants who knowingly violated the law.

WHEREFORE, The Plaintiffs, by and through undersigned counsel, respectfully request that this Court deny the Motion to Dismiss filed by the Defendants pursuant to Fed. R. Civ. P. 12(b)(6) and for such other and further relief as is just and reasonable.

Respectfully submitted,

/s/ James J. Macchitelli

James J. Macchitelli
Attorney for Plaintiffs
Illinois Bar Number 6208773
1501 Perimeter Drive #400
Schaumburg, Illinois 60173
(847)-414-4532
jimmymacclaw@gmail.com
Admitted - Pro Hac Vice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above was provided to counsel for the Defendants via CM/ECF Filing this 17th day of May, 2022, at or near 3 am.

/s/  James J. Macchitelli

James J. Macchitelli
Attorney for Plaintiffs
Illinois Bar Number 6208773
1501 Perimeter Drive #400
Schaumburg, Illinois 60173
(847)-414-4532
jimmymacclaw@gmail.com
Admitted - Pro Hac Vice

# PLAINTIFF'S

# EXHIBIT "A"

```
1              UNITED STATES BANKRUPTCY COURT
                 MIDDLE DISTRICT OF FLORIDA
2                     TAMPA DIVISION

3


4
     ------------------------- :
5                                :
     In re: Sarah Katherine      :Case No.:
6    Sussman,                     :8:17-bk-008959-RCT
                                  :
7                                 :Chapter 7
     Debtor,                      :
8                                 :
     ------------------------- :
9


10


11    DEPOSITION OF:       JASON GORDILLO

12    DATE:                February 22, 2019

13    TIME:                10:10 a.m. to 12:25 p.m.

14    PLACE:               Reporters on Madison
                           418 E. Madison St.
15                         Tampa, FL 33602

16    PURSUANT TO:         Notice by Counsel for
                           Defendants
17
      REPORTED BY:         BETH MALONE
18                         Notary Public
                           State of Florida at Large
19
                           Pages 1 - 122
20


21


22              REPORTERS ON MADISON
                 418 E. Madison St.
23                Tampa, FL 33602
                   (813)237-2996
24


25
```

```
1    APPEARANCES:

2         MICHAEL R. KANGAS, ESQUIRE
          P.O. Box 399
3         Tampa, FL 33602

4              Counsel for Plaintiff

5

6         DOV SUSSMAN, ESQUIRE
          5005 W. Laurel St., Suite 203
          Tampa, FL 33607
7
               Counsel for Defendant Sarah Sussman
8

9         SHELDON D. MCMULLEN, ESQUIRE
          Law Office of Sheldon D. McMullen, P.A.
10        1501 S. Dale Mabry Hwy, Suite A10
          Tampa, FL 33629
11

12             Counsel for Defendant Teresa Gaffney

13                     *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25
```

3

**I N D E X**

Examinations                                          Page

  BY MR. SUSSMAN                                        4
  BY MR. MCMULLEN                                      59
  CERTIFICATE OF OATH                                 120
  CERTIFICATE OF REPORTER                             121
  ERRATA SHEET                                        122


**E X H I B I T S**

  No.                                                 Page

    1   Defendants'                                    68
    2   Defendants'                                    77
    3   Defendants'                                    82
    4   Defendants'                                   106
    5   Defendants'                                   110

```
 1                    THE COURT REPORTER:  Do you swear or
 2          affirm that the testimony you are about to
 3          give will be the truth, the whole truth, and
 4          nothing but the truth?
 5             THE WITNESS:  I do.
 6    THEREUPON,
 7                      JASON GORDILLO,
 8          having been first duly sworn or affirmed,
 9          was examined and testified as follows:
10                       EXAMINATION
11    BY MR. SUSSMAN:
12          Q.   Good morning.
13          A.   Good morning, sir.
14          Q.   My name is Dov Sussman.  I'm here to take
15      your deposition.  To my right is Sheldon McMullen
16      who is also consult for other parties in this case
17      -- related to this matter.
18          A.   Good morning.
19          Q.   Please identify yourself for the record?
20          A.   My name is Jason Gordillo.
21          Q.   And you're here in response to a subpoena
22      that I issued, correct?
23          A.   Yes, sir.
24          Q.   Have you ever had your deposition taken
25      before?
```

1      A.    I don't believe I have.  I've taken

2    depositions but I don't think I've ever sat in a

3    deposition as a witness.

4      Q.    Are you represented by counsel?

5      A.    No, I have no one with me.  No.

6      Q.    Okay.  So for purposes of this deposition

7    today you personally are not represented by

8    counsel?

9      A.    Correct.

10     Q.    For the purposes of this deposition

11    today, in your capacity at the Hillsborough County

12    Sheriff's Office are you represented by counsel?

13     A.    For what regard?

14     Q.    The question is are you represented -- in

15    your capacity as an employee of Hillsborough

16    County Sheriff's Office do you have an attorney

17    representing you in your capacity as an employee

18    of the HCSO?

19     A.    In this matter or just in general?

20     Q.    Well, we'll take it sequentially.  In

21    this matter?

22     A.    No.

23     Q.    Generally?

24     A.    No, I have no need for one.

25     Q.    All right.  Please describe your position

```
 1    at the HCSO.
 2         A.    I am legal counsel with the Hillsborough
 3    County Sheriff's Office and I represent the
 4    sheriff's office in all matters and its employees.
 5         Q.    When you say you're legal counsel, is
 6    that analogous to in the commercial sector being
 7    general counsel?
 8         A.    In-house counsel.
 9         Q.    Huh?
10         A.    In-house counsel.
11         Q.    In-house counsel.
12         A.    Employed by the sheriff's office.
13         Q.    So is there outside counsel?
14         A.    On certain matters we do go outside, for
15    certain matters, but we have a staff of --
16         Q.    Certain matters?
17         A.    Correct.
18         Q.    Like what?
19         A.    Such as if there's an employment matter
20    between, let's say a deputy and the sheriff's
21    office, we'll hire outside counsel for things of
22    that nature.  Worker's Compensation claims go
23    outside.  So anything really between an employee
24    and the agency will go to outside counsel.
25         Q.    So if I refer to you as in-house counsel
```

```
 1      for the Hillsborough County Sheriff's Office would
 2      that be correct?
 3           A.    Yes.
 4           Q.    All right.  What are your duties beyond
 5      what you just explained and beyond the
 6      differentiation you expressed with respect to
 7      outside counsel and in-house counsel --
 8                MR. KANGAS:  Object to form.
 9           Q.    -- what do you do on a daily basis?
10           A.    My job every day is different.  I teach
11      multiple classes.  I teach at the Police Academy,
12      I teach at in-service training.  I teach at module
13      training.  I teach classes for Child Protection
14      Investigations Division.  I am the assigned
15      attorney for the Child Protection Investigation
16      Division and the Civil Process Section.  That
17      doesn't mean I don't get involved in other
18      matters, but I'm typically the go-to attorney for
19      those two sections.  Any questions that comes from
20      the command staff, anything that needs to be
21      reviewed, whether that be SOP's, contracts,
22      anything of that nature I, as well as pretty much
23      any attorney, will review them and handle
24      litigation on behalf of the sheriff's office and
25      its employees.
```

```
1          Q.    What is the Civil Process Section?
2          A.    The Civil Process Section is our division
3     that's made up of both sworn and civilian and they
4     handle all civil process in the county for the
5     sheriff's office.
6          Q.    And you would be -- and if I'm
7     mischaracterizing this please, you know, correct
8     me on that, but you would be the liaison with the
9     civil section?
10         A.    I don't believe liaison is the word I
11    would use.  I am the attorney that they typically
12    call when they have questions.
13         Q.    Uh-huh.  Which is different than liaison?
14         A.    I don't know what your -- depends on your
15    definition of liaison.
16         Q.    Yeah, like it does with everything else.
17               All right.  So as I understand what you
18    just said, if within the Civil Process Section an
19    individual had an issue, a deputy had an issue
20    they would call you?
21         A.    Typically.
22         Q.    Okay.  What about beyond -- I take it
23    that you've referenced Civil Process Section you
24    are excluding anything that would be criminal in
25    nature?
```

1      MR. KANGAS:  Object to form.

2      A.   I don't know if I understand the

3   question.

4      Q.   All right.  For example if a deputy had

5   an issue or question about whether or not he had

6   sufficient probable cause for an arrest, would he

7   call you?

8      A.   He could.  Like I said, there's multiple

9   attorneys in our office.  He or she may call any

10   one of us.

11      Q.   How many attorneys are there in your

12   office, if you know?

13      A.   Give me one second, let me go through the

14   list.  Currently there's six.

15      Q.   Say it again?

16      A.   Six.

17      Q.   Six.  There are six attorneys.  Do you

18   all work together or do you work different shifts

19   or --

20      A.   We all work together.

21      Q.   Because the sheriff's office is a 24/7

22   job?

23      A.   Correct.

24      Q.   So if recourse to one of the in-house

25   counsel -- I take it you're all in-house counsel,

1    the six?

2        A.    Correct.

3        Q.    Okay.  If recourse is needed, if there's

4    a road deputy out there at 2:00 in the morning and

5    he or she has a question, do you have a rotating

6    assignment?

7        A.    We do.

8        Q.    Uh-huh.

9        A.    We always have one attorney on call.  We

10   take a month at a time.  However, even despite

11   that we take calls, all of us take calls whenever.

12   Typically the person on call is the one that will

13   get the phone calls.  However, there are times

14   that I've gotten calls.  I got a call this week 8,

15   9:00 from the Child Protection Investigation

16   Division even though I'm not on call, but it's

17   because they're used to dealing with me so they

18   called me when they had a question.

19       Q.    Do you ever interface with, say, the

20   State Attorney's Office?  You used to have a duty

21   prosecutor on 24 hours.  Is there ever any

22   occasion where --

23       A.    There are.

24             MR. KANGAS:  Object to form.

25       Q.    -- you interface with them?

```
1        A.    I mean, I've been to scenes where I've
2   been called out, let's say a shooting that the
3   on-call state attorney would have been there.
4        Q.    Uh-huh.
5        A.    So situations like that, yes.
6        Q.    Uh-huh.  So you're responding -- although
7   your -- are you designated as in-house civil
8   attorney or is there such a designation in the
9   sheriff's office?
10       A.    We're all in-house counsel.
11       Q.    Whatever comes through the door?
12       A.    Pretty much.
13       Q.    Yeah, all right.  And how long have you
14   been practicing law?
15       A.    I just hit 18 years.
16       Q.    18 years, uh-huh.  And I take it you're
17   admitted to practice in Florida?
18       A.    Yes.
19       Q.    Where else?
20       A.    Florida, the Middle District of Florida,
21   Northern District of Florida, Eleventh Circuit,
22   U.S. Supreme Court.
23       Q.    No other states?
24       A.    No.
25       Q.    Okay.  Have you been admitted to any
```

```
 1    other jurisdiction?

 2         A.    Not that I can think of.

 3         Q.    None that you can think of?

 4         A.    Correct.

 5         Q.    Okay.  But presumably you would know if

 6    you were standing in front of a court and a judge

 7    in Minnesota?

 8              MR. KANGAS:  Object to form.

 9         A.    Yeah, I've never been to another state.

10         Q.    You are, I take it, being cautious in

11    articulating the answer just in case it turns out

12    12 years ago you stood in front of a judge in

13    Connecticut?

14              MR. KANGAS:  Object to form.

15         A.    I can tell you I've never been out of

16    state in front of another judge.

17         Q.    Okay.

18         A.    However, if we've had a case that I may

19    have had to file a motion in that I'm just

20    electronically filed a motion and that was the end

21    of it, I'm being cautious with that.  I don't

22    think I have, but just to be safe.

23         Q.    Understood.

24         A.    But I can tell you I've never been to

25    another state, standing in front of another court.
```

1       Q.    Okay, yeah.  It is still possible to be

2    admitted pro hac vice, for example, in the

3    Southern District or the Northern District but you

4    say you're a member there and that's why in my

5    question I'm trying to differentiate between out

6    of state pro hac vice rather than, you know, in

7    state in the Northern or Southern District?

8              MR. KANGAS:  Object to form.

9       Q.    Just so you understand the scope of my

10   question.

11      A.    Okay.

12      Q.    Where did you attend law school?

13      A.    University of Florida.

14      Q.    What year did you graduate?

15      A.    2000.

16      Q.    2000?

17      A.    Yes.

18      Q.    And you were admitted to Florida in 2000?

19      A.    Yes, sir.

20      Q.    And where did you do your undergraduate?

21      A.    South Florida.

22      Q.    University of South Florida?

23      A.    Yes, sir.

24      Q.    What year did you graduate there?

25      A.    '97.

```
 1          Q.    Okay.  It looks like -- and correct me if
 2    I'm wrong -- you had a fairly traditional track.
 3    You went to undergraduate, you went to law school,
 4    admitted to practice, got a job?
 5          A.    Yes.
 6                MR. KANGAS:  Object to form.
 7          Q.    Okay.  So other than the sheriff's office
 8    have you worked as an attorney anywhere else?
 9          A.    I worked at the Office of the Attorney
10    General prior to the sheriff's office.
11          Q.    At the AG's Office?
12          A.    Yes.
13          Q.    What years did you work there?
14          A.    I started in late 2000 until mid 2003.
15          Q.    So were you admitted to practice or you
16    were --
17          A.    I was already admitted.
18          Q.    Okay.  Which division of the AG's Office
19    were you in?
20          A.    The Children's Legal Services.
21          Q.    Civil?
22          A.    Children's Legal Services.
23          Q.    And your supervisor there?
24          A.    Was Bill Navas.
25          Q.    Spell the last name?
```

```
 1          A.     N-A-V-A-S.
 2          Q.     Okay.  And I take it in 2003 is when you
 3     collaterale over to the HCSO?
 4          A.     Correct.
 5                 MR. KANGAS:  Object to form.
 6          Q.     And you've been there ever since?
 7          A.     For four months, four to five months I
 8     left for a brief stint and I went to a law firm
 9     but then I returned back to the sheriff's office.
10          Q.     Okay.  Which law firm?
11          A.     I believe, I don't know if it's still the
12     name but at time if I'm not mistaken it was Luks,
13     Santinello, Perez and Gold.
14          Q.     I'm going to ask you a favor, okay?  I
15     have a hearing loss from a long time ago.  Do you
16     think you could speak a little bit louder?
17          A.     Absolutely.
18          Q.     I can pretty much -- we're right on the
19     borderline --
20          A.     All right.
21          Q.     -- in terms of my able to --
22          A.     I apologize.
23          Q.     No, don't apologize.  It's my problem,
24     not yours.
25                 Okay.  So let's go back to that question.
```

```
 1    The name of the law firm as you remember it?

 2         A.    As a remember it was Luks, Santinello

 3    Perez, Patrello and Gold.

 4              MR. KANGAS:  And that's L-U-C-H-S,

 5         correct?

 6              THE DEPONENT:  I believe it was L-U-K-S.

 7              MR. KANGAS:  Okay.

 8              THE DEPONENT:  I believe.

 9  BY MR. SUSSMAN:

10         Q.    Okay.  And you were there four months?

11         A.    Four to five months.

12         Q.    And then you went back to the sheriff's

13    office?

14         A.    Correct.

15         Q.    Why did you leave?

16         A.    It was an opportunity to become a named

17    partner over there so I went there for four or

18    five months and then I realized it's not exactly

19    my cup of tea.  I liked the sheriff's office, so I

20    went back.

21         Q.    Uh-huh.  Have you discussed this

22    deposition with anyone prior to appearing today?

23         A.    Only the record section in regards to the

24    documents that were requested.

25         Q.    Uh-huh.
```

```
 1        A.    But other than that, no.  I believe

 2   Sergeant Polk, also, in regards to documents that

 3   were requested.

 4        Q.    So you talked to Sergeant Michelle Polk?

 5        A.    In regards to what documents were

 6   requested.

 7        Q.    And you say you talked to someone at

 8   records?

 9        A.    Correct.

10        Q.    Do you know who?

11        A.    I believe it was Teresa -- sorry, whoever

12   was on the subpoena, Teresa Sadrianna.

13        Q.    Okay.

14        A.    Bobby Rizzo.

15        Q.    Who else?

16        A.    Bobby Rizzo.

17        Q.    And who is Bobby Rizzo?

18        A.    She's over in records.

19        Q.    Okay.

20        A.    And Ivis Spano, who is also --

21        Q.    Say it again?

22        A.    Ivis.  I think it's I-V-I-S Spano.

23        Q.    Okay.  Anyone else?

24        A.    And she's also in records.

25        Q.    Anyone else?
```

```
 1        A.    No.

 2        Q.    Speak to Mr. Kangas?

 3        A.    No.

 4        Q.    Speak to anyone at his office?

 5        A.    Nope.

 6        Q.    Speak to Mr. Baumann?

 7        A.    No.  I don't think I know who Mr. Baumann

 8   is.

 9        Q.    Phillip Baumann?

10        A.    No.

11        Q.    Okay.  Have you ever had any

12   conversations with Mr. Kangas or Mr. Baumann?

13        A.    Mr. Kangas I have spoken to.  It's been

14   some time.  Mr. Baumann, I may have met him once

15   if it's the same person I'm thinking of.  I'm not

16   even sure if I know who he is.

17        Q.    Okay.  And when was the last time you

18   spoke to Mr. Kangas?

19        A.    Spoke to Mr. Kangas?

20        Q.    Uh-huh.

21        A.    I couldn't tell you.  It's been some

22   time.

23        Q.    You clarified when you said by "spoke."

24   Were there other meetings other than telephonic

25   conversations?
```

1       A.    We've e-mailed over the past, I guess,

2    two-and-a-half years such as, like, when my

3    deposition was supposed to be taken in December he

4    let me know it wasn't happening.

5       Q.    He let you know what was happening?

6       A.    That it was not taking place, the

7    deposition, if I'm not mistaken.  Just things like

8    that, but other than that, no.

9       Q.    Uh-huh.  I see you have a file folder

10   with you.  Did you bring any of the documents I

11   requested?

12      A.    I did bring the stuff that records had to

13   fulfil that request.

14      Q.    Uh-huh.

15      A.    And to prevent the 1:30.  So I don't know

16   if you'd like them now.  I do know they sent you

17   some e-mails for clarification.

18      Q.    Right.  May I take a look at those?  And

19   if you want to take a break while I'm doing that,

20   that's fine or you can sit here, whatever.

21      A.    That's fine.  Here's -- in red they put

22   the responses, the things that -- and I have the

23   clarification e-mails they sent you.  As far as

24   what they're able to provide at this time, this is

25   what they have at this time.

```
1          Q.    Seems that whoever responded to this
2     wants quite a lot of clarification.  Did you ever
3     look at the documents requested?
4          A.    I've looked at your requests.
5          Q.    You did?
6          A.    At the requests you made?
7          Q.    Yeah.
8          A.    Yeah, they were attached to my subpoena,
9     as well.
10         Q.    Yeah.  I know they were but have you
11    reviewed them?
12         A.    Reviewed your list?
13         Q.    This, this document?
14         A.    Yes.
15         Q.    Okay.
16         A.    It's my understanding --
17         Q.    Do you have a copy of this or --
18         A.    I have my subpoena.
19         Q.    All right.  I'm going to ask you some
20    questions from this.  Do you want me to make a
21    copy of this so that you have one in front of you,
22    as well?
23         A.    That would probably be helpful.
24              MR. SUSSMAN:  Ma'am, can you make one
25         each for each one of us.
```

```
 1              (There was a discussion off the record.)
 2     BY MR. SUSSMAN:
 3          Q.   All right.  I'm going to -- for the
 4     purposes of the record the deponent has provided
 5     me with a copy of the documents requested which
 6     was attached to the subpoena.  And the one we're
 7     working from is "Annotations" in red, which were
 8     made by whom?
 9          A.   The records division.
10          Q.   Okay.  Did you review the document
11     requested?
12          A.   And, again, we're speaking about this
13     list, correct?
14          Q.   The list.
15          A.   Yes.
16          Q.   You did?
17          A.   Yes.
18          Q.   Okay.  All right.  Beginning with item
19     number one, "All copies of e-mails to and from
20     Michael Kangas from August 1st, 2013 to the
21     present."  Notation I see is, "Clarification
22     requested.  E-mailed to attorney 2/19/2019."
23          A.   Correct.
24          Q.   Okay.  What sort of clarification is
25     required?
```

1    A.    You got the e-mails between yourself and
2    the records division.
3    Q.    Was that --
4    A.    It was an e-mail that went to you, my
5    understanding, from the records section.
6    Q.    Right.  I'm asking what is so
7    incomprehensible about the sentence, "all copies
8    of e-mails"?  I mean, you either have them or --
9    someone has them or they don't.
10    MR. KANGAS:  Object to form.
11    A.    Well, one problem is it's very broad.  It
12    doesn't say between who and who and Michael
13    Kangas.
14    Q.    "All copies to and from Michael Ryan
15    Kangas."  This is the document that was attached
16    to your deposition, right?
17    A.    Correct.
18    MR. KANGAS:  Object to form.
19    A.    And are you speaking me as the witness or
20    on behalf of the records section?
21    Q.    Did you read the instructions that came
22    with your deposition?
23    MR. KANGAS:  Object to form.
24    A.    Yeah, it was a subpoena to deposition --
25    Q.    I'm looking at Schedule A, Definitions

```
 1    and Instructions.  Do you have that?
 2         A.    Yes.
 3         Q.    Okay.  Item capital A, reading from
 4    Schedule A, Definitions and Instructions, "You,
 5    yours used herein means you and Hillsborough
 6    County Sheriff's Office and includes any and all
 7    agents, employees, servants, officers, directors,
 8    attorneys and any other person or entity acting or
 9    purporting to act on his behalf, or any other
10    entity or person under the direct control of
11    Hillsborough County Sheriff's Office."
12              Is that self explanatory?
13         A.    Yeah.
14              MR. KANGAS:  Object to form.
15         Q.    So going back to the documents requested,
16    what is so incomprehensible about item Number One?
17              MR. KANGAS:  Object to form.
18         A.    Again, this is something that was
19    requested through the records section.
20         Q.    It's also attached and there's a portion
21    of your --
22              MR. KANGAS:  Will you let him answer the
23         question?
24    BY MR. SUSSMAN:
25         Q.    -- subpoena that indicates production of
```

1    documents requested?

2       A.    Actually, when I'm looking at the

3    subpoena --

4       Q.    Yeah.

5       A.    -- to me it's a subpoena to testify at a

6    deposition.  There's an X in front of the

7    testimony, there's not an X in front of the

8    production.

9       Q.    Well, let me just be very clear.  I'm not

10   trying to give you a hard time.

11      A.    I understand.

12      Q.    I'm just looking at this and to me -- and

13   I've done this quite a long time -- these are

14   fairly simple requests.  And I've never had

15   someone respond by saying, gee, we need

16   clarification for all copies of text messages.

17   Particularly when it's combined with definitions

18   and instructions that attempt to clarify the use

19   of certain pronouns like you, yours, that sort of

20   thing.  So I'm a little -- I'm sitting here

21   thinking that pretty much I'm getting stonewalled;

22   is that true?

23           MR. KANGAS:  Object to form.

24      A.    No.  And again, the document you're

25   looking at came from the records section.  Okay.

```
 1          Q.    Did you have anything to do with
 2    preparing this?
 3          A.    I did not.
 4          Q.    Okay.  So you didn't verify whether any
 5    of these documents existed?
 6          A.    That's not my job.
 7          Q.    Okay.
 8          A.    That's the records section's job.  And if
 9    you read the e-mail they sent to you on
10    February 19th specifically regarding the e-mails,
11    they give you exactly what they needed from the
12    technical staff, which is our IT department.
13          Q.    What they needed is what they got,
14    which is my subpoena and the instructions of the
15    definitions, so --
16                MR. KANGAS:  Object to form.
17          Q.    All right.  Let's go to item 77, which is
18    the last item on the last page.  Do you have that
19    file with you today?  Is there such a file?
20          A.    There is, and I'll show you what I
21    brought today.  It's what consists of our file and
22    what records pulled, and I have a copy that
23    records provided me to bring to you today in
24    compliance with their subpoena.
25          Q.    You want someone to make a copy of what
```

 1    you brought before you hand it to me?

 2         A.    It's fine.  This is the copy I brought

 3    and also have the copy that they brought.

 4         Q.    Okay.  This is my copies then that I can

 5    keep or do you need me to make copies of them?

 6         A.    You can keep them if you want, that's

 7    fine.  Which would be the return of service from

 8    the writ and then what I also brought were photos

 9    that were taken on the day of the eviction by

10    Corporal Harris as he was doing his walk through.

11         Q.    Well, he would have to be here to

12    authenticate them, wouldn't he, and he's not.

13              MR. MCMULLEN:  Because you're not

14         appearing as a records custodian, correct?

15              THE DEPONENT:  Well, in regards to the

16         1:30 subpoena, since I'm bringing everything

17         and we're all here I'd like to just --

18    BY MR. SUSSMAN:

19         Q.    Is this part of the file?

20         A.    -- get that over with.  I'm sorry?

21         Q.    Is this part of the file?  This

22    photograph you just put on the table, is this part

23    of the file?

24              MR. KANGAS:  Object to form.

25         A.    I consider it being --

```
 1        Q.    Is there a file?

 2        A.    There was no file.

 3        Q.    There's no file on an eviction?

 4              MR. KANGAS:  Object to form.

 5        A.    Everything is electronically held.

 6        Q.    This is it, one page?

 7        A.    Correct.

 8        Q.    That's all.  That's all you got?

 9        A.    Yes.

10        Q.    No file, no notes, no investigating

11   officer's report, no officer on duty's report?

12        A.    This is the action that was taken.

13        Q.    What does your training manual require?

14   Is there a training manual?

15        A.    You asked for SOP's.  Those have been

16   provided.  An SOP index has been included and we

17   have included two --

18        Q.    Yeah, that's the other thing I need

19   clarification on was that I asked for a training

20   manual and no one knows what that means.

21              MR. KANGAS:  Object to form.

22        A.    We know what training manuals -- we don't

23   have training manuals.  We have the SOP's.

24   There's the SOP on enforceable writs, so I do have

25   that with me.
```

```
1        Q.    That's the documents that is your -- that

2   offers guidance; is that correct?

3        A.    It's a guideline.

4        Q.    Yeah, okay.  But there is no formal file

5   that would contain that and contain the on-duty

6   officer's assessment of what they did, what they

7   saw, this is it?

8              MR. KANGAS:  Object to form.

9        A.    It's a piece of paper and he took photos

10   of this instance, which is what they always do.

11        Q.    Well, the photographs are not part of a

12   file, you say there's no file, right?  So what are

13   we doing with the photographs?

14              MR. KANGAS:  Object to form.

15        A.    When you speak of file I think of ten

16   years ago before everything was digital and

17   electronic, I'm thinking of files.

18              Now this document right here indicates

19   what was done, both when the writ was posted and

20   when the writ was executed, both by time, by date

21   and who did it.  The photographs were taken and,

22   like I said before, they don't always get taken,

23   but in this instance because --

24        Q.    But we have no one here to authenticate

25   those photos?
```

```
 1        A.    Well, you can subpoena that person to
 2   come for deposition.
 3        Q.    But they're not part of your file because
 4   you don't have a file?
 5              MR. KANGAS:  Object to form.
 6        A.    They are part of the file.
 7        Q.    They are part of the file.  So you do
 8   have a file.
 9        A.    That's right.
10        Q.    It's an electronic file?
11        A.    Electronic file.
12        Q.    Okay.  What else is in that electronic
13   file?
14        A.    Well, like I said, it would be this and
15   it would be that.  Now, are they together?  No,
16   but --
17        Q.    They're not together.  Where are they?
18        A.    I'm not the IT person.
19        Q.    How did you get those?
20        A.    Those photos?
21        Q.    Yeah.
22        A.    They came from Corporal Harris.  He made
23   me aware, he took them and he --
24        Q.    So he took the photos, right?
25        A.    Yes.
```

```
 1        Q.    And are they part of your electronic file
 2    relative to this action?
 3        A.    It depends what you want to call
 4    electronic file.  Do I have them saved in my
 5    computer?  Yes, I do.  Do I have this saved in my
 6    computer?  Yes, I do.
 7        Q.    You saved them on your computer.  Where
 8    did you save them from, where did you get them?
 9        A.    This I got from the records section of --
10        Q.    Okay.
11        A.    -- from processing.
12        Q.    Okay.  And where did you get these --
13              MR. KANGAS:  Objection.
14        A.    That would have come through Corporal
15    Harris.
16        Q.    So what's he do, he carried them around
17    in his back pocket?
18        A.    Those photos?
19        Q.    Yeah.
20        A.    No.
21        Q.    Where did he come up with them?
22        A.    I'd imagine he took them on the camera.
23        Q.    I mean, most crime scenes I'm familiar
24    with or any kind of civil action scene, police
25    officers and deputies make a record and that
```

```
 1    becomes part of the record.
 2           MR. KANGAS:  Object to form.  There's no
 3       evidence of any crime scene.
 4           MR. SUSSMAN:  All right, you've made your
 5       objection.
 6  BY MR. SUSSMAN:
 7       Q.   Answer the question.  Is there any
 8   official file in which these photographs are
 9   found, electronic or otherwise?
10           MR. KANGAS:  Object to the form.
11       A.   You'd have to ask someone in civil
12   process.
13       Q.   Okay.  So --
14       A.   I have them saved in my computer and I
15   have this saved in my computer.
16       Q.   And you've got the photographs from
17   Corporal Harris, right?
18       A.   He's the one that took them, yes.
19       Q.   Okay.  But they're not part of an
20   official electronic file?
21           MR. KANGAS:  Object to form.
22       Q.   If you know.  You don't know, right?
23       A.   I don't know.
24       Q.   Okay.  Who would know?
25       A.   I would imagine possibly Corporal Harris,
```

1    possibly Sergeant Polk and the people that work in

2    civil process.

3         Q.    All right.  Can you look at document

4    requested, item 76, please?

5         A.    Yes.

6         Q.    Okay.  Item 76, "Any and all training

7    manuals for the Hillsborough County Sheriff's

8    Office regarding bankruptcy and automatic stays."

9    And in red the response is, "Refer to Federal

10   Statute 11 U.S. C, Section 362"?

11        A.    Correct.

12        Q.    Uh-huh.  But that doesn't -- now you've

13   opined that you don't really have training

14   manuals, and correct me again if I'm wrong, but

15   you do have standard operating procedures?

16             MR. KANGAS:  Object to form.

17        A.    Correct.

18        Q.    Uh-huh.  So is there a Standard Operating

19   Procedure or procedures that provide reference to

20   what's known as the automatic stay, 362?

21        A.    If you look at 75 which talks about

22   operating manuals, which I guess the --

23        Q.    That's economic crimes investigation.

24             MR. KANGAS:  Mr. Sussman, will you let

25        him finish his answer, please?

```
 1            MR. SUSSMAN:  Just make your objection.
 2       He's perfectly capable of --
 3            MR. KANGAS:  Well, I'm just trying to
 4       make sure the record's clear because you keep
 5       interjecting in the middle of his sentence.
 6  BY MR. SUSSMAN:
 7       Q.   Yeah, right.
 8       A.   If you look at 75, I believe what the
 9  records section took operating manuals to mean
10  operating procedures.
11       Q.   Okay.
12       A.   So they do reference SOP, DIS 325.10
13  which I brought with me today.  Looking at that I
14  think what it is is there's the word bankruptcy in
15  it, so I think when they did a search through all
16  the SOP's --
17       Q.   Well, what I'm looking at is in red.  It
18  says "SOP," which I assume means Standard
19  Operating Procedures.  I don't know what DIS
20  means.  Do you know what that means?
21       A.   I believe that's the Department of
22  Investigative Service.
23       Q.   Okay.  And there's a -- is that a
24  regulation or Florida Statute that's referenced
25  after that?
```

```
 1        A.    That's the number of that SOP --

 2        Q.    Okay.

 3        A.    -- which I do have a copy of it.

 4        Q.    So it refers direct -- and in

 5   parentheses, "Economic Crimes Investigation,"

 6   close parentheses.  Why does it say that?

 7        A.    Because I would imagine that's probably

 8   the name of the Economic Crimes Investigation is

 9   the subject of the SOP.

10             Now in that it doesn't -- looking at it I

11   don't think it discusses automatic stays, but the

12   word "bankruptcy" is in it.  That's why they

13   pulled it for you.

14             As far as automatic stay goes, I don't

15   believe there's any SOP with the word "automatic

16   stay" in it.

17        Q.    Okay.  Well, does that mean this

18   particular SOP, 325.10, deals with economic

19   crimes?

20        A.    Yes.

21        Q.    And also deals with bankruptcy?

22        A.    No.  As I said before, it has the word

23   bankruptcy in it.  When they did a search for

24   bankruptcy, all SOPs that came up with the word

25   bankruptcy in it, this was the SOP that came up.
```

```
 1      If I have none -- they also did a search for the
 2      ones that say automatic stay; there were no SOPs
 3      that came up.
 4           Q.    There were no SOPs on automatic stay?
 5           A.    Correct, from my understanding.
 6           Q.    But the word bankruptcy comes up along
 7      with Economic Crimes Investigation; am I hearing
 8      you correctly?
 9           A.    Would you like to see the SOPs?
10           Q.    Yes, please.
11           A.    And if you look --
12           Q.    Is this my copy again?
13           A.    These are being brought to you in
14      compliance with the subpoena for 1:30.  If you
15      look at D 4 on page one, it says "planned
16      bankruptcy schemes."  That's where the word
17      bankruptcy comes up in that SOP.
18           Q.    All right.  I'm looking Roman Numeral I,
19      Purpose, is that where you're directing me or are
20      you directing me to sub part D, I, Advance Fee
21      Schemes?
22           A.    You've got the documents.
23           Q.    What?
24           A.    I don't have the documents.
25           Q.    Well, let's make some copies of this
```

 1   because otherwise we'll have to go back and forth

 2   and hand it across the table.

 3       A.    It looks like Roman Numeral IV, titled

 4   Definitions.  If you go down to Subsection B and

 5   then under there there's a list of 15, one through

 6   15, number four is Planned Bankruptcy Schemes

 7   right there.  That's where the word bankruptcy is.

 8       Q.    And that's what would have pulled this up

 9   on the search?

10       A.    That's correct.

11             MR. SUSSMAN:  May we have copies of this

12       please?

13             (There was a discussion off the record.)

14   BY MR. SUSSMAN:

15       Q.    All right.  I am looking at a document

16   you produced and the subject is Economic Crimes

17   Investigation.  Am I reading that correctly?

18       A.    Yes.

19       Q.    Okay.

20       A.    And I believe it's in --

21       Q.    Tell me why this is what I get back in

22   terms of standard operating procedures?

23       A.    Because in number 75 of the documents

24   requested --

25       Q.    Yeah.

1      A.    -- it asks for any and all operating

2  manuals for Hillsborough County Sheriff's Office

3  regarding bankruptcy and automatic stays.

4      Q.    Okay.  Is this the only thing you've got

5  on bankruptcy and automatic stays in your Standard

6  Operating Procedures?

7           MR. KANGAS:  Object to form.

8      A.    If that's what the records was able to

9  pull up when they did a search for both bankruptcy

10  and then for automatic stays, then this would be

11  the only SOP where either of those words, or I

12  guess terms, is referenced in.

13      Q.    Uh-huh.  So in your opinion does that

14  mean the underlying bankruptcy in this matter was

15  being viewed as an economic crime --

16           MR. KANGAS:  Object to form.

17      A.    Not at all.

18      Q.    -- to the investigation?

19      A.    Not at all.

20      Q.    But yet I have this in my hand?

21      A.    It's in response to your request.

22      Q.    I didn't ask for anything about an

23  economic crime investigation.

24      A.    No.  You asked for something about

25  bankruptcy and automatic stays and this is the --

```
 1        Q.    Right.  So does that mean that from the
 2   sheriff's office --
 3        A.    This is the one SOP with bankruptcy in
 4   it, sir.
 5        Q.    So from the sheriff's office perspective
 6   bankruptcy is always an economic crime?
 7        A.    Not at all.
 8        Q.    All right.  What is the automatic stay,
 9   how does it work?
10             MR. KANGAS:  Object to form.
11        A.    You're asking me as a witness or as an
12   attorney?  How are you --
13        Q.    You are an attorney.
14        A.    I understand.  Automatic stay, when
15   someone files for bankruptcy under certain
16   conditions and certain circumstances they are
17   protected, depending on the situation and the
18   circumstances.  It's about an eleven page law with
19   very specific conditions.
20        Q.    11-C362?
21        A.    Correct.
22        Q.    What is the applicable law, federal law,
23   with respect to the implementation of an automatic
24   stay in a matter involving a Writ of Possession
25   and/or eviction?
```

```
 1              MR. KANGAS:  Object to form.
 2         Q.   How does that work?
 3         A.   In a typical landlord tenant --
 4         Q.   This is not landlord tenant.
 5         A.   I understand, but your question --
 6         Q.   My question is --
 7         A.   Are you asking in this particular
 8    instance --
 9         Q.   Yes.
10         A.   -- that we're sitting here with your
11    family?
12         Q.   Both.
13         A.   Both what?
14         Q.   Let's start -- okay, let's back up.
15              How does the automatic stay work?
16         A.   I think I already answered that question.
17              MR. KANGAS:  Object to form.
18         Q.   Answer it again.
19              MR. KANGAS:  Asked and answered.  Move
20    on.
21         A.   Somebody files for bankruptcy and certain
22    things get stayed, certain types of collections
23    certain types of debts that they owe, certain
24    types of judicial processes that are going through
25    get stayed.  Some do, some do not, it depends on
```

1       the situations, it depends on the circumstances.

2       It also depends on what is part of the person's

3       estate when they do file for bankruptcy.

4            Q.    It does, huh?  Can you cite me to

5       something in 362 that says that, because I don't

6       recall it having a whole lot of exemptions.  I am

7       sure they're there.

8            A.    Do you have a copy of it in front of you?

9            Q.    That's what?

10           A.    Do you have a copy of it in front of you?

11           Q.    I do.  Would you like my copy?

12           A.    No.  362 Subsection (a), number two.

13           Q.    Yep.

14           A.    "The enforcement against the debtor or

15      against property of the estate of a judgment

16      attained before the commencement of the case under

17      this title.  Number three --"

18           Q.    The automatic stay works against A 2?

19                 MR. KANGAS:  Object to form.

20           A.    It operates as a stay of --

21           Q.    Yeah.  A 2 is prevented by the

22      application of the automatic stay.  Is that your

23      understanding of what's in A 2?

24           A.    Again, something that's property of the

25      estate, the person's estate, correct.

```
 1          Q.    Or against the property of the estate, of
 2     a judgment obtained before the commencement of the
 3     case under this title.  Okay.
 4              How about sub (4), Any act to create,
 5     affect or enforce any lien against the property of
 6     the estate?
 7          A.    Again, if you look at it it depends on
 8     what's considered the property of the person's
 9     estate.
10          Q.    Well, what is?
11              MR. KANGAS:  Object to form.
12          A.    I don't understand the question.
13          Q.    All right.  What about homestead
14     property?
15          A.    What about it?
16          Q.    Can you affect a lien against homestead
17     property?
18              MR. KANGAS:  Object to form.
19          A.    Depends on the -- I think it's a case by
20     case basis.
21          Q.    Oh, really?
22          A.    I think so.
23          Q.    Yeah?  Ever reviewed Article 10, Section
24     4 of the Florida Constitution?
25          A.    I'm sure I have, if I can --
```

```
1        Q.    There's three exceptions --
2        A.    Provide it offhand.
3        Q.    Only three.
4              MR. KANGAS:  Object to form.  You're
5        testifying.
6              MR. SUSSMAN:  Just make your objection.
7  BY MR. SUSSMAN:
8        Q.    Answer the question.  Are you familiar
9     with the exemptions under Article 10, Section 4?
10       A.    I'd have to take a look at.  I don't know
11    off the top of my head.
12       Q.    Well, does it ever occur to you that when
13    you're attempting to dispossess an owner of their
14    property, their homestead property, you might want
15    to take a look at Article 10, Section 4?
16             MR. KANGAS:  Object to form.
17       A.    If we were dispossessing the owner of a
18    home --
19       Q.    Which you were?
20             MR. KANGAS:  Object to form.
21       A.    Which we were not in this case.
22       Q.    Absolutely you were.  That's --
23             MR. KANGAS:  Objection, argumentative.
24       Q.    That's a fascinating statement.  Explain
25    that to me.
```

```
 1        A.    In this matter, and I looked up the civil
 2   case and then I reviewed the bankruptcy case that
 3   was filed the day before the eviction, in this
 4   matter as I understand it through the civil case
 5   there was a home that was owned by your wife's
 6   father?  There was a will that -- with specific
 7   instructions for your wife to sell the home, pay
 8   off whatever expenses, fees, whatever he had,
 9   proceeds to go to Christ the King Catholic Church.
10        From my understanding from reading the
11   documents a month after he died instead of doing
12   that, which was what was in the will, the house
13   was deeded to the Sussman Family Trust that I
14   believe was created a day before this deed.  The
15   daughter, Sarah Sussman, was made the trustee of
16   that trust and --
17        Q.    Who provided you with this information?
18        A.    I looked it up in the case.
19        Q.    Uh-huh.  Did someone talk to you about
20   this case?  Because your facts are in error.  And
21   I'm not saying --
22             MR. KANGAS:  Objection, argumentative.
23        Q.    -- you're a liar --
24        A.    No.
25        Q.    I'm saying that whoever gave you this
```

44

1    information gave you bad information.

2        A.    I got the information because when I'm

3    provided with this case number, because we posted

4    a writ, and there was a discussion about whether

5    we should proceed or not, I then looked up the

6    case number, which is the top of this, 14-CA-3762.

7    I then went through the docket, pulled the

8    documents that were pertinent to me to make my

9    decision.  I also was made aware that bankruptcy

10   was filed on behalf of Sarah Sussman.  I pulled

11   the bankruptcy and looked at that petition, as

12   well, and I looked at all of this information

13   prior to making my decision.

14       Q.    And is it your opinion the automatic stay

15   would not have prohibited the eviction?

16             MR. KANGAS:  Object to form.

17       A.    In this instance?

18       Q.    Uh-huh.

19       A.    No.

20       Q.    Correct?

21       A.    Correct.  The eviction --

22       Q.    It would not have prohibited it?

23       A.    The eviction went forward.

24       Q.    Right.  But there was no automatic stay,

25   correct?  That happens when you file?

1              MR. KANGAS:  Object to form.

2     A.    I'm sorry, can you rephrase?

3     Q.    When one files for bankruptcy the

4 automatic stay takes effect immediately?

5     A.    However, there are exceptions to that.

6     Q.    It takes effect.  In that -- did you file

7 a motion, did anyone file a motion to lift

8 automatic stay?

9     A.    That's not for us to do.  We're a

10 disinterested party.

11     Q.    So without a motion to lift automatic

12 stay you just elected it was okay to dispossess

13 people of their property?

14              MR. KANGAS:  Object to form.

15     A.    No.  We dispossessed people that were on

16 property that wasn't theirs.

17     Q.    That's your erroneous interpretation.

18              MR. KANGAS:  Object to form.

19     Q.    All right.  What about Article Ten,

20 Section Four, did you check the property

21 appraiser's office?

22     A.    I looked at the documentation in the

23 legal matter saying that the house no longer

24 belonged to you, it belonged to them through the

25 court order, when it says the relief in the

```
1       complaint is being granted.  Which then tells me
2       that this house now belongs to the estate like it
3       was supposed to per the will and then there was a
4       Writ of Possession done.
5           Q.   Now you're a lawyer.  You say you read
6       the order?
7           A.   Correct.
8           Q.   Was there a lengthy recitation of
9       findings of fact?
10              MR. KANGAS:  Object to form.
11          A.   I believe, if I'm not mistaken, the
12      defendants in that case were defaulted.
13          Q.   Still has to be findings of fact.
14              MR. KANGAS:  It's been affirmed.
15          Q.   Did you happen to notice the date on
16      which the final hearing took place?  It's
17      expressed right in the first four or five lines of
18      the order.
19          A.   Off the top of my head, I don't know.
20          Q.   It's blank.  It's blank.
21              MR. KANGAS:  Object to form.
22              MR. SUSSMAN:  Well, you wrote the order
23          so you should fucking know, right?
24              MR. KANGAS:  Excuse your language,
25          Mr. Sussman.
```

1              MR. SUSSMAN:  Yes, do excuse my language.

2     BY MR. SUSSMAN:

3         Q.    So your interpretation is that Article

4     Ten, Section Four doesn't apply, correct?

5         A.    My interpretation is this house no longer

6     belonged to the Sussman's and never did.

7         Q.    That's your interpretation and you --

8              MR. KANGAS:  Asked.

9         Q.    -- base it on what?

10        A.    My review of the documents in Case Number

11    14-CA-3762.  Furthermore when I look at the

12    bankruptcy that was filed it was filed as Sarah

13    Sussman as an individual.  The deed I was looking

14    at was to the family trust, Sussman Family Trust.

15    The family trust did not file the bankruptcy.

16    Furthermore I looked into your daughter, Sarah

17    Sussman, and found indications that she was living

18    in Washington D.C. and working in Washington D.C.

19    for some time.  At the time of the eviction I

20    spoke to Corporal Harris and I asked him, ensure

21    that Sarah Sussman is there or not there.

22              He spoke you, you indicated to him, my

23    understanding, and don't quote me on this, but

24    your indication to him is she hasn't been there in

25    some time and you then changed your answer to, she

1      left town because she can't take the stress.

2          Q.    I said that?

3          A.    That's my understanding.

4          Q.    Seems like a lot of hearsay here.

5                Getting back to --

6          A.    So to answer your question, if there was

7      protection under an automatic stay it would have

8      been to Sarah Sussman only, who was not even

9      present.

10         Q.    What about Article Ten, Section Four,

11     does that protect trusts?

12         A.    I would have to look at it.

13         Q.    Uh-huh, you would.  In any event Article

14     Ten, Section Four is limited to the -- has a

15     limited number of exceptions.  There are three.

16     Your liens that you talk about aren't part of

17     those exceptions.

18         A.    Again, I'd have to look --

19         Q.    So you were in error on that.

20         A.    If you say so.

21         Q.    I do.

22         A.    I'm not here to have a legal argument.

23     I'm here to answer questions, so --

24         Q.    All right.  Well, then let's go back to

25     the photographs that you showed me earlier.  Some

1    of them are inside the house.

2         A.    Correct.

3         Q.    And you say Corporal Harris took those

4    photographs?

5         A.    Yes.

6         Q.    Are you sure of that?

7         A.    Yes.

8         Q.    So humor me.  If the operation of the

9    automatic stay would have prevented the eviction,

10   and I say -- use the word "if," then your

11   deputies' presence on the property would be a

12   violation of the Fourth Amendment?

13             MR. KANGAS:  Object to form.

14        A.    If there would have been an automatic

15   stay I would have told them not to do anything and

16   they wouldn't have shown up that day.

17        Q.    So is it your opinion that you can

18   interpret whether or not the automatic stay

19   applies?

20             MR. KANGAS:  Object to form.

21        A.    I was called by the Civil Process Section

22   for direction and I gave my opinion based on all

23   the documentation I looked at, both in the civil

24   case and the bankruptcy case.

25        Q.    So you decided to overturn bankruptcy

1  law?

2      A.    I did not overturn bankruptcy law.

3      Q.    We shall see.  But if, in fact, Article

4  Ten, Section Four and/or the automatic stay would

5  have prohibited the actions taken that day, your

6  deputies were in violation of the Fourth

7  Amendment; is that correct?

8          MR. KANGAS:  Object to form.

9      A.    I don't believe so.

10     Q.    You don't think so?  So search and

11 seizure's just fine?

12     A.    They're allowed under the law and under

13 qualified immunity if there's a reasonable

14 mistake, that's allowed for under the qualified

15 immunity.

16     Q.    Yeah, reasonable is a funny word.  Seems

17 like you did an awful lot of research on this case

18 prior to allowing the unlawful eviction to go

19 forward.  Why did you put that kind of research

20 into it?

21          MR. KANGAS:  Object to form.

22     A.    I put similar research into every time I

23 get a phone call.

24     Q.    Uh-huh.

25     A.    And you can say, "uh-huh," all you want

```
 1    but I know how I do my job.  I do it thoroughly
 2    every time deputies call me with questions and
 3    when civil process calls me with questions.
 4         Q.   Well, I'm sure of that.
 5              MR. KANGAS:  Object to form.  Quit
 6         commenting on his testimony.
 7              MR. SUSSMAN:  I agreed with him.  What is
 8         your problem?  He told me he puts that kind of
 9         effort into every case he deals with and I
10         said, "I'm sure you do."
11              THE DEPONENT:  It's more the tone.
12              MR. SUSSMAN:  I'm agreeing with him.
13              MR. KANGAS:  No, it was the tone that you
14         stated it in.
15              MR. SUSSMAN:  He seems like the kind of
16         person who would put the time into a case.
17              THE DEPONENT:  Well, I don't feel that
18         from your expressions on your face and the
19         tone of your voice, but we'll keep moving
20         forward.  That's fine.
21    BY MR. SUSSMAN:
22         Q.   Did I call you a liar?  I agreed --
23         A.   Spoken word?  No, but I would say --
24         Q.   Aww, come on.
25         A.   -- your facial expressions and your tone
```

1     of voice say otherwise, but that's fine.

2          Q.    Well, maybe next time I'll wear a mask.

3     I don't know.  Yeah, I don't know what you're

4     getting at around here.

5               So you made a determination that Article

6     Ten, Section Four didn't apply, am I right?

7               MR. KANGAS:  Object to form.

8          A.    I made my determination based on the

9     civil case, 14-CA-3762, and my review of the

10    bankruptcy.

11         Q.    Okay.  And my question --

12         A.    And my review of the automatic stay

13    statute.

14         Q.    And my question was did you determine

15    that Article Ten, Section Four --

16         A.    Are you asking if I looked at that

17    constitutional provision that day?

18         Q.    Yes.

19         A.    No, I did not.

20         Q.    Earlier I asked you and I don't think --

21    I think in the melee we didn't get an answer.  Did

22    you review the property appraiser's records for

23    that particular house?

24         A.    I don't know.

25         Q.    Okay.

```
1        A.    I couldn't answer that question if I did
2    or did not.
3        Q.    Okay.  So your best answer is?
4        A.    I don't know.
5        Q.    You don't know?
6        A.    I don't know if I did or not.
7        Q.    Okay.  Have you ever reviewed the
8    property appraiser's records for that house?
9        A.    I have no idea.
10        Q.    You don't know if you have ever reviewed
11    those records?  It's not a trick question.  If you
12    haven't, you haven't.
13        A.    I don't know.
14        Q.    Okay, good.
15        A.    I mean, we're talking about something --
16    this is October of 2017.
17        Q.    Which you seem to have a fairly good
18    memory of.
19        A.    Of what I did do.  If you're asking did I
20    do other things that I don't have memory of.  Or
21    if you're asking me if I ever looked at it, I
22    don't know.
23        Q.    Uh-huh.  Have you ever indicated that
24    this particular eviction was done as an exception?
25        A.    Not that I'm aware of, no.
```

```
 1          Q.    Okay.  All right.  So just a reprise, you
 2     didn't review the property appraiser's records?
 3               MR. KANGAS:  Object to form.
 4          A.    I don't know if I did or not.
 5          Q.    Okay.  And you did not review Article
 6     Ten, Section Four of the Florida Constitution?
 7          A.    I did not review that that day.
 8          Q.    And you made a determination that the
 9     automatic stay provision, 11 u.s.c. 362, was not
10     applicable in this proceeding?
11               MR. KANGAS:  Object to form.
12          A.    Correct.
13          Q.    And then you green lighted the eviction?
14               MR. KANGAS:  Object to form.
15          A.    Correct.
16          Q.    Okay.  Let's take a short break.  I'm
17     going to confer with my colleague and, you know,
18     hopefully we can get you out of here at a
19     reasonable time.
20          A.    That's fine.  While we're still on the
21     record, the 1:30 is this --
22               MR. MCMULLEN:  We're going to talk about
23          that.
24               THE DEPONENT:  Okay.
25               MR. MCMULLEN:  Not yet.
```

```
 1              THE DEPONENT:  I'm sorry?

 2              MR. MCMULLEN:  Not yet.

 3              THE DEPONENT:  Not yet?

 4              MR. MCMULLEN:  They're not released yet.

 5              THE DEPONENT:  Okay.

 6              (There was a recess in the proceedings.)

 7   BY MR. SUSSMAN:

 8       Q.   Okay.  I want to return for a moment to

 9   documents requested, the copy we made of what you

10   brought here, the one with the red annotations.

11   Okay?  Can you explain any of the annotations

12   here?  All the annotations seem to say,

13   "clarification request.  Clarification request."

14   Do you know what specifically the annotator meant

15   by indicating clarification request?  What

16   clarification is required?

17       A.   Do you want to pinpoint one of these?

18       Q.   Any one of them.

19       A.   You want to go number one?

20       Q.   I mean, I'm looking at one --

21       A.   No.  I'm saying, you want to give me one

22   of them and I'll tell you what the problem is?

23   Because I have e-mails that were sent to you from

24   the records section, so I can read to you what

25   they said in the e-mail.
```

1      Q.   I'm not interested in you reading to me.

2   I'm interested in your present sense impression of

3   what clarification is required that you know from

4   your own experience.

5      A.   Well, we have, I believe, over 4,000

6   employees at the sheriff's office.  I assume when

7   you say all copies of e-mails to and from Michael

8   Ryan Kangas, so we'll take number one from

9   August 23rd to present.  A, that's a very big

10   request.  You're also asking are they supposed to

11   look for all 4,000 employees or plus 4,000

12   employees?  Are there certain e-mail addresses or

13   domains you're looking at?  You know, things of

14   that nature.

15            Again, text messages, so take number two

16   for instance.  Text messages between who and

17   Michael Ryan Kangas?  Again, we're talking about

18   over 4,000 people and all their phones.  I mean,

19   these are all things you know.  You got e-mails

20   and I don't know if you responded to them or not

21   or gave clarification or not so they could run

22   these things.  But I don't think it's unusual to

23   ask for clarification when you get such a broad

24   request.  I believe the record section and our IT

25   section know what they're doing.

1      Q.    But you don't know specifically what type
2    of clarification is requested?
3      A.    As I said before, I can read you the
4    e-mails that were sent to you specifically.
5      Q.    But of your own volition you don't know
6    this, you can only read someone else's e-mail.  So
7    I would really have to have the records custodian
8    in here to get a definitive answer to that
9    question?
10     A.    Well, and the problem with that is my
11   understanding of that it wasn't a deposition, it
12   was basically a document drop off, so I don't
13   believe there's going to be a deposition.
14     Q.    That's what it's supposed to be but it
15   looks like I'm going to have to get her to set
16   that person down for a deposition.
17     A.    Or provide them with a clarification.
18     Q.    If you don't really know -- all you know
19   is what you're told, you don't really know --
20     A.    Or you can provide them with the
21   clarification they need and they can start pulling
22   the documents for you.
23     Q.    Well, I think the document speaks for
24   itself.
25     A.    Well, it's very overbroad.

```
 1         Q.    That's a nice objection.
 2               MR. SUSSMAN:  Do you have any questions?
 3               MR. MCMULLEN:  I have some questions.
 4               MR. SUSSMAN:  Okay.
 5               MR. KANGAS:  I'm not sure you've got
 6         standing to inquire.
 7               MR. MCMULLEN:  You can raise that later.
 8         I'm a creditor just like you are.  You're no
 9         different than I am, so if I don't have
10         standing, either do you, so --
11               MR. KANGAS:  Well, you're not a party to
12         the action.
13               MR. MCMULLEN:  It doesn't matter.  It
14         doesn't matter.  I'm going --
15               MR. KANGAS:  You're not a party and I'm
16         objecting to your inquiry.
17               MR. MCMULLEN:  You're not going to object
18         to anything in here, okay?
19               MR. KANGAS:  I did just -- well, for the
20         record I'm objecting to his --
21               MR. MCMULLEN:  Okay.  We can go forward
22         now.
23               MR. KANGAS:  I'm going to put my
24         objection on the record, Mr. McMullen, and
25         then go ahead and proceed because you're not
```

```
 1          going to listen to it.

 2               I'm objecting to Mr. McMullen inquiring

 3          because Ms. Gaffney is not a party to the

 4          litigation set for trail which this deposition

 5          is scheduled on, on four different matters on

 6          April 15, 2019.  Although his client is

 7          interested in the bankruptcy she is not a

 8          party to the ongoing litigation, therefore is

 9          not entitled to inquire at this deposition.

10               MR. MCMULLEN:  Okay.

11                    DIRECT EXAMINATION

12    BY MR. MCMULLEN:

13          Q.    Mr. Gordillo, and I'm saying your name

14    right, I apologize if I'm --

15          A.    That's fine.

16          Q.    Yeah.  All right.

17               You previously testified here about your

18    current job.  You're an in-house counsel with the

19    Hillsborough County Sheriff's Office and you do

20    work with the Civil Process Section.  Is that an

21    accurate description of what it's called?

22          A.    Yes.

23          Q.    All right.  What are your duties in

24    regards to specifically the Civil Process Section?

25          A.    If they ever need legal guidance they
```

1  call me.

2     Q.   Okay.  And how long have you actually

3  been working in that Civil Process Section?

4     A.   I don't work in the Civil Process

5  Section.

6     Q.   Okay.  Is there a specific attorney

7  within the Hillsborough County Sheriff's Office

8  assigned to the Civil Process Section?

9     A.   I can't say assigned.  I'm pretty much

10  the one they call.  So I'd say 95 percent of -- if

11  I'm available I'm the one they're calling for.

12     Q.   Okay.

13     A.   If I'm completely unavailable, such as

14  let's say they call me right now they'll probably

15  talk to someone else.  If it's something that can

16  wait they'll wait until I get back later in the

17  day or the next day.

18     Q.   And how long have you been, you know,

19  doing or advising the people in the Civil Process

20  Section, let's say?

21     A.   Years.  It's been years.

22     Q.   Okay.

23     A.   I couldn't give you an exact year.

24     Q.   That's fine.  I mean, it's more than five

25  years probably?

```
 1          A.     I would say, yeah.
 2          Q.     Okay.  And who exactly does work in the
 3     Civil Process Section?  First off, how many
 4     employees are there specifically dedicated to
 5     that?
 6              MR. KANGAS:  Object to form.
 7          A.     I couldn't tell you that.  I don't know.
 8          Q.     You don't know.  Okay.  Specifically what
 9     are the parts to the Civil Process Section?  In
10     other words, is there like an intake person, a
11     records person, an enforcement person, I guess, a
12     deputy, specific deputy that goes out?  Tell me a
13     little bit about it.
14              MR. KANGAS:  Object to form.
15          A.     I can tell you what I know.
16          Q.     Based upon what you know, that's fine.
17          A.     Sergeant Polk is in charge of the Civil
18     Process Section.
19          Q.     Okay.
20          A.     There are three corporals under her, if
21     I'm not mistaken.  Under the three corporals
22     there's eight to 10 deputies.  I'm not exactly
23     positive the number.
24          Q.     Okay.
25          A.     There's also civilian process servers.  I
```

1    don't know how many.

2        Q.    Okay.

3        A.    And then there's also civilian support

4    staff who handle the paperwork and process all the

5    paperwork and I don't know how many of them there

6    are and they're all assigned in different types of

7    -- some are maybe assigned to witness subpoena,

8    some are to writs of levy, writs of possession, I

9    think they break it up, I think.

10       Q.    Okay.  Who are the three corporals

11   underneath Sergeant Polk?

12       A.    Oh, gosh.

13       Q.    Well, we already mentioned Corporal

14   Harris.

15       A.    Corporal Harris, yes.  I believe there's

16   a Corporal Greves or Graves.

17       Q.    Okay.

18       A.    I'm trying to think of the name.  This is

19   really embarrassing.  I can't think of the

20   names --

21       Q.    Okay.

22       A.    -- off the top my head.

23       Q.    If it comes back to you later that's

24   fine.  Understood.  Understood.

25             Tell me a little bit about the steps and

1    kind of walk me through the steps based on what

2    you understand and what you know, having worked

3    with these people in the Civil Process Section.

4    When you receive -- when the Hillsborough County

5    Sheriff's Office receives a Writ of Possession

6    kind of walk me through the step of what happens.

7        A.    To what I do or what they do?

8        Q.    Well, let's start with what you do.

9        A.    I'm only called if there's a question

10   about one.

11       Q.    Okay.  So is it fair to say then that

12   there will be writs of possession received within

13   that unit processed and you're never called, you

14   have no knowledge of it -- in other words, you

15   have no direct knowledge of it, no one ever speaks

16   to you about it, it just goes through the process

17   and it's done?

18       A.    I would say most of them --

19       Q.    Okay.

20       A.    -- fall into that category.

21       Q.    Okay.  When you are called who is it who

22   contacts you?

23       A.    Could be anyone from the deputy involved

24   to the corporal, to the sergeant, just depends.

25       Q.    All right.  And it could be at any stage

```
 1     of the process?
 2         A.    Could be.
 3         Q.    And it could be at the intake immediately
 4     when they get it, it could be after they've taken
 5     a look at it and they have a question, or it could
 6     be in the field when they're attempting to execute
 7     it, right?
 8             MR. KANGAS:  Object to the form.
 9         A.    It could be.
10         Q.    Okay.  So it could be at any of those
11     stages.  Okay.
12         A.    And I guess --
13         Q.    Go ahead.
14         A.    -- just to amend my answer, if it's early
15     on in the process it would probably be one of the
16     support staff people and maybe there's something
17     irregular about the writ itself that they would
18     call me or send me an e-mail about it.
19         Q.    Okay.
20         A.    So I guess if we're going to go that far
21     back into it, which is very rare but I can't say
22     it's never happened, that probably would have been
23     a support staff person who may have called me.
24         Q.    Now let's get a little bit more specific
25     here in regards to -- well, actually, no.  Let me
```

```
 1    strike that.
 2            Let me go here.  In regards to the writs
 3    of possession --
 4        A.    Okay.
 5        Q.    Okay?  Where does your knowledge on writs
 6    of possession come from?
 7        A.    What do you mean?
 8            MR. KANGAS:  Object to form.
 9        Q.    As far as when you're called in to make a
10    recommendation as far as it goes, what will you
11    look at in order to determine whether or not that
12    writ needs to be processed?
13        A.    It depends on what the problem is.
14        Q.    Okay.
15        A.    Or what the question is.
16        Q.    All right.
17        A.    I'll look at statutes.  I'll look at case
18    law.  I will look a the individual writ.  I may go
19    into that case and pull past pleadings.  In this
20    instance there was a bankruptcy filed.  I will go
21    and pull the bankruptcy and take a look at that.
22    It's different time every time.  I can't give you
23    a --
24        Q.    Do you ever speak to any of the
25    attorneys that are involved in that litigation?
```

1      A.     About writs of possession or just in

2  general?

3      Q.     In general.  In other words, if there's a

4  case and you see and it involves a writ and

5  there's some question on it, do you contact one or

6  both of the attorneys and ask them what this --

7      A.     Oh, I'm sorry.  I thought you meant the

8  attorneys in my office.

9      Q.     No, no, no, no, no.  I'm asking the

10  outside attorneys that are involved in the case.

11      A.     There are times that I speak to

12  attorneys.

13      Q.     All right.  Do you recall in this

14  specific one that we're talking about in the

15  14-CA-3762 that you had occasion to speak to any

16  of the attorneys involved with that case?

17      A.     The date before the eviction, after I

18  spent basically the whole day looking into the two

19  cases, the civil case and the bankruptcy case,

20  looking up the automatic stay statute, things of

21  that nature.  I did have an occasion to speak to

22  Mr. Kangas to see if there was anything else I was

23  missing in this case.

24      Q.     Okay.

25      A.     The next morning, the morning of the

```
1   eviction I got a call from Sergeant Polk that
2   morning and it was early, it was before I even got
3   to work so it would have been before eight, where
4   she told me that she had called Ms. Gaffney to let
5   her know.  At that time Ms. Gaffney said her
6   attorney would like to speak to me or speak to the
7   sheriff's office attorney.
8           Ms. Gaffney was provided the phone number
9   for her attorney to call and I believe the
10  eviction occurred -- I want to say -- if I'm
11  looking at the writ it looks like they went back
12  at 1:00 p.m. that afternoon, so there was about a
13  five-hour window.  Sergeant Polk called me and
14  told me that I may be getting a call from
15  Ms. Gaffney's attorney and I said that's fine
16  because I would have spoken to that attorney, as
17  well, to find out if there's anything I missed or
18  any information they may have that's pertinent,
19  but I never got a phone call.
20      Q.   Okay.  Okay.  All right.  Now when did
21  you first become aware of this particular
22  eviction?
23      A.   If I can refer back to this?
24      Q.   Okay.  And what are you referring to, by
25  the way?
```

68

```
 1        A.    This is the --
 2        Q.    Let me see a copy, please.
 3        A.    It's in reference to Item 77 when it asks
 4    for our case file, this is our return of service.
 5        Q.    All right.
 6        MR. MCMULLEN:  I want to attach this as
 7        Exhibit 1 to his deposition.  Okay.
 8            (Defendants' Exhibit 1 was marked for
 9        identification.)
10  BY MR. MCMULLEN:
11        Q.    So the first thing that you -- so was
12    this document presented to you first or this
13    document tells you when you first became aware of
14    this?
15        A.    This document's just telling me -- I'm
16    looking at this for reference of date --
17        Q.    Okay.
18        A.    -- which is all I'm doing, to answer your
19    question.
20        Q.    All right.  So you have no independent
21    recollection, this is refreshing your
22    recollection?
23        MR. KANGAS:  Object, to form.
24        A.    I know more -- I believe I know the day
25    of the week.  The date I have to look at this --
```

```
 1        Q.    Gotcha.

 2        A.    -- to remind myself of the actual date.

 3        Q.    Okay.

 4        A.    It was -- the writ was posted at the

 5   property on 10/23/17.  If you look at the very

 6   bottom remarks --

 7        Q.    Okay.

 8        A.    -- of the three boxes.  They all say the

 9   same thing.

10        Q.    Got it.

11        A.    I was informed that afternoon, which I

12   believe -- if I'm not mistaken I believe that was

13   a Monday, to my recollection.  I could be wrong,

14   but I believe it was a Monday.  So I was first

15   made aware late, and I'm talking -- it was towards

16   the end of the day so fourish, 3:30, somewhere in

17   there I became aware of it.  I did some

18   preliminary research that day and then I spent

19   most of, if not -- almost all of the 24th looking

20   into it, which is when I pulled the two cases, did

21   my research and that, and then the actual eviction

22   occurred the following day, which would have been

23   Wednesday -- I believe Wednesday the 25th.

24        Q.    So let me back you up here real quick.

25   You say that the writ was posted on the 23rd.  How
```

1    did you become aware?

2        A.    Sergeant Polk called me because I guess

3    she got a call from Teresa Gaffney.

4        Q.    Okay.  So you spoke to Sergeant Polk on

5    the 23rd --

6        A.    Correct.

7        Q.    -- and she asked you to look into it?

8        A.    Correct.

9        Q.    Okay.  Now you say that you took a look

10   at the civil case.

11       A.    Correct.

12       Q.    Okay.  Are you aware of how voluminous

13   that case actually is?

14       A.    Yes, I am.

15       Q.    Okay.  Can you tell me how, based upon

16   how voluminous that is, you were able to

17   specifically target documents in such a short

18   amount of time to make your decision?

19       A.    Like I said, I spent pretty much the

20   whole day the 24th, if not the entire day.  I

21   think that's all I worked on that day.

22       Q.    Okay.

23       A.    So I go into the case and I would have

24   first pulled the complaint to see what the case

25   was even about.  From there, again, it's a

1      voluminous case but a lot things are notices for
2      production, notices, subpoena's, things of that
3      nature; skip over those.
4          Q.    Right.
5          A.    Typically if I see motions filed I tend
6      not to go first to the motions, I'll first look
7      for orders to those motions.
8          Q.    Okay.
9          A.    Then when I look at the orders if I need
10     to go back and find the motions that the orders
11     reference to see if I need to see what's in the
12     motions, I'll do that.  But I typically focus on
13     the complaint, I focus on the orders and on this
14     case I also wanted to see when the Writ of
15     Possession was actually issued by the court.  So
16     it did take quite some time, but I kind of push
17     away a lot of the stuff.
18         Q.    Okay.  And other than your independent
19     research and looking at the documents did you
20     speak with anyone else in regard to this case on
21     the 24th in making your decision?
22         A.    As far as making my decision?
23         Q.    Yes.
24         A.    I did speak to Mr. Kangas just briefly to
25     see if there was anything I was missing, but that

1    did nothing to change my decision, or alter my

2    decision in any way.  I did that after I had done

3    all my research and I was just looking to see if

4    there was anything that I was missing.  Same as I

5    would have spoken to Ms. Gaffney's attorney if I

6    had gotten a call from that person the next day.

7         Q.   Well, did you reach out to Mr. Kangas or

8    did Mr. Kangas call you?

9         A.   I honestly don't remember.

10        Q.   Okay.  Now you're an attorney, you've

11   been practicing, I think you said 18 years --

12        A.    Correct.

13        Q.    -- approximately?  And I think you

14   previously testified you're familiar with

15   homestead but you could not cite Article 10,

16   Section 4 of the Florida Constitution, right?

17        A.    I couldn't sit here and --

18        Q.    Okay.  All right.  Based upon your

19   experience and knowledge in dealing with the Civil

20   Process Section and writs of possession, if you're

21   dealing with homestead property does that change

22   how you do your research and any recommendations

23   that you make when there's a bankruptcy that's

24   been filed?

25             MR. KANGAS:  Object to form.

1        A.    I will answer it this way, because I did

2    not look at that in this particular instance.

3        Q.    Okay.

4        A.    If you want to know why I can go into --

5        Q.    I'll get into that, just let you finish

6    this question.

7        A.    Okay.  If I were -- such as when I speak

8    to attorneys, if an attorney points me  in that

9    direction -- this is why I don't mind talking to

10   attorneys.  I'll prefer some -- many occasions

11   I'll talk to attorneys.

12       Q.    Right.

13       A.    If I talk to an attorney that will point

14   me in that direction, hey, have you looked at

15   this?  There have been times that I have changed

16   my answer one way or another depending on what an

17   attorney points me towards.  So, again, had

18   Ms. Gaffney's attorney called me that morning to

19   point me in that direction I would have looked at

20   that and considered it, which, again, would have

21   been prior to the eviction actually happening.

22       Q.    Okay.

23       A.    But that didn't occur and I didn't look

24   at it myself on the 24th.

25       Q.    Okay.  Now why did you not look at it on

1    the 24th?

2       A.    The reason why I didn't look at it on the

3    24th is after reviewing the civil case it was

4    clear to me that that house -- and I don't -- the

5    house should have gone to the estate.  It was

6    deeded to the family trust through the daughter

7    for $10 in violation of that will, which prompted

8    that lawsuit.  So however you want to word that,

9    I'm not going to put my labels on it, but that

10   was the reason for that lawsuit.

11            Through the litigation of that lawsuit

12   the court found that house belongs to the estate,

13   took it back to the estate.  I then was made aware

14   that there was a bankruptcy filed, so my whole

15   thought process was, who did the house belong to

16   and what does the bankruptcy do.  And when I

17   looked at it that bankruptcy and the automatic

18   stay does not pertain to that house because that

19   house was not lawfully in the possession of

20   Gaffney or any Sussman.  That house had already

21   been given back to the estate through the courts

22   about a month prior.  And I could be wrong about

23   the exact date.  I don't know the exact dates off

24   the top of my head, but that was not part of the

25   estate of Sarah Sussman.

1          Additionally, even when I looked at the

2     deed the house was not deeded to Sarah Sussman who

3     filed the bankruptcy as an individual, so it

4     wasn't Sarah Sussman's home.  So I looked at this

5     through that angle, through that lens of who this

6     property belonged to, who filed the bankruptcy and

7     what are the integral parts of that bankruptcy.

8          So to answer your question, the homestead

9     thing never even -- I never even got into that

10    because I never -- it never entered my mind as

11    part of the process.

12    Q.    And looking at it through that lens, is

13    that because you had a conversation with

14    Mr. Kangas --

15    A.    Not at all.

16    Q.    -- who painted that lens for you?

17    A.    No.  Like I said, I spoke to Mr. Kangas

18    during the afternoon of the 24th.  I had done my

19    research all day on the 24th.  I spoke to

20    Mr. Kangas after I had done all my research and

21    basically knew what I was about to tell Sergeant

22    Polk and Corporal Harris and the Civil Process

23    Section.  I just wanted to see if there was

24    anything I was missing.

25          Likewise, had Ms. Gaffney's attorney

1     called me the next day and provided me information

2     that would have changed my mind I would have done

3     that, because I've done that in the past.

4          Q.    And you've been licensed and practicing

5     for 18 years?

6          A.    Correct.

7          Q.    What is your knowledge of probate law?

8          A.    I'm not a probate lawyer, if that's what

9     you're asking.

10         Q.    I'm trying to understand here and make

11    sure I get the question right here.  If you're not

12    a probate lawyer and you have not practiced in

13    probate law how are you able to interpret and make

14    a legal conclusion as far as what a will says?

15         A.    Because it's pretty easy to read the will

16    that says you will sell the house and pay off my

17    fees and give the proceeds to Christ the King

18    Catholic Church.  I don't think you even have to

19    be a lawyer to understand that.

20         Q.    In your research of the case did you find

21    the agreement that was reached between Christ the

22    King Catholic Church and Ms. Gaffney that was done

23    prior to the deed being executed from Ms. Gaffney

24    to Ms. Sussman?

25         A.    I don't remember specifically what I

1    looked at.  I do know I saw documentation where

2    Christ the King was basically asking to get out of

3    the whole lawsuit all together.  I do remember

4    seeing that.  If you're asking me specific pieces

5    of paper that I saw a year-and-a-half ago, I don't

6    exactly -- couldn't tell you exactly what every

7    little piece of paper I pulled up was.  Just

8    because I didn't consider certain things doesn't

9    mean I didn't see them.

10       Q.    Okay.  All right.  But would that have

11   made a difference for you knowing that Christ the

12   King said, you know what, you can do this.  We're

13   accepting of it, we're allowing this transaction

14   to happen?

15            MR. KANGAS:  Object to form.

16       A.    The biggest thing to me was the court

17   order saying that all the relief in the complaint

18   -- and I forget exactly how it's worded -- is

19   being granted.

20            MR. MCMULLEN:  I'm going to mark this

21       Exhibit 2.

22            (Defendants' Exhibit 2 was marked for

23       identification.)

24   BY MR. MCMULLEN:

25       Q.    Is this the final judgment that you're

1    talking about that you reviewed?

2        A.    I don't think it was this one I was

3    looking at.

4        Q.    Can you read the top though, as far as,

5    does that look like it's been recorded in the

6    official record which would imply to you that that

7    is the actual final judgment?

8        A.    I don't know.  I can tell you why --

9    looking at the top why I didn't look at it on the

10   24th because this looks like it was entered on the

11   26th.

12       Q.    Well, but if the one you reviewed would

13   have been the final judgment is there any reason

14   to believe that the one you reviewed --

15       A.    I'm not saying the one I reviewed was the

16   final judgment.

17       Q.    Then what was it that you reviewed?

18       A.    It was a court order.

19       Q.    Okay.  So let me go back here though.

20   Does the court order allow the Hillsborough County

21   Sheriff's Office to execute a Writ of Possession?

22       A.    No.  The Writ of Possession actually does

23   that.  Which the Writ of Possession was done after

24   the court order.

25       Q.    Okay.  So you have a court order and then

1    a Writ of Possession --

2         A.    Correct.

3         Q.    -- and that allowed you then to execute

4    the Writ of Possession?

5         A.    Yes.

6         Q.    Okay.  All right.  So to issue a writ of

7    possession though you don't need a final judgment?

8         A.    Again, we're following -- if that's the

9    case you want to make in front of the judge, if

10   the judge issued a Writ of Possession or the clerk

11   issued a Writ of Possession, that's something I'd

12   take up with the court.

13        Q.    Okay.  So in other words because you guys

14   have a Writ of Possession you're not going to look

15   back to see whether or not it's a valid writ

16   because it doesn't follow from a final judgment?

17        A.    What I saw was an order referring back to

18   the complaint that all relief in the complaint is

19   being granted because of the default.  The relief

20   being sought in the complaint was to gain

21   possession back of the house.  Then there was also

22   emergency motions that were filed by the

23   defendants in this case that were that week, and I

24   don't know the exact date, that were struck down

25   by Judge, I think it was Barbas, if I'm not

1    mistaken, who had the case at that time.

2         Q.    Okay.

3         A.    So I do know that there were actions

4    taken in front of Judge Barbas to try to undo the

5    writ of possession and undo whatever orders that

6    had been done prior that Judge Barbas denied.

7         Q.    Let me ask you something here.  The style

8    of the case, previously you testified that -- and

9    correct me if I'm wrong here -- that the deed was

10   to Sarah as the trustee of the Sussman Family

11   Trust?

12        A.    I believe.

13        Q.    Which is partially how you base your

14   decision and your recommendation in this case,

15   correct?

16        A.    Correct.

17        Q.    Is she also listed individually there in

18   the style of the case?

19        A.    Both, correct.

20        Q.    Okay.  Based upon your training and

21   experience as a lawyer and having worked in the

22   Hillsborough County Sheriff's Office, if one is

23   listed individually doesn't that also mean they

24   have an individual interest in whatever property

25   would be there which is why they're listed

1      individually?

2              MR. KANGAS:  Object to form.

3      A.     I think a lot of times attorneys put

4      multiple labels on people just to be safe in a

5      lawsuit, but that deed was very clear it was to

6      the family trust.  She was the trustee of that.

7      Q.     Okay.

8      A.     And her bankruptcy was very clear, she

9      was doing it as an individual which are two

10     separate types of labeled entities, or whatever

11     you want to call it.

12     Q.     As you sit here though can you testify to

13     trust law and point to anything in the Florida

14     Statutes or anything that would say just because a

15     property is titled in a trust doesn't mean a

16     person doesn't have some sort of individual

17     ownership or homestead rights in the property?

18             MR. KANGAS:  Object to form.

19     A.     I'm not going to sit here as an expert in

20     trust law.

21     Q.     Okay.  Now you said that you looked at

22     the case and you looked at the bankruptcy.  Did

23     you do a search of any of the official records of

24     Hillsborough County?

25     A.     Such as like what he was talking about

1    before, the tax appraiser's and all that?

2        Q.    The tax appraiser, the official records

3    to see if anything else was filed?

4        A.    I remember seeing the deed.

5        Q.    Okay.

6        A.    And I don't know if I saw the deed

7    separate through official court documents or

8    official records or if it was the deed as it was

9    attached to the complaint.  Because I know it was

10   attached to the complaint but I also know it's

11   been filed separately on its own.  That's why I'm

12   saying, I don't know if I saw the deed separately

13   through another source or it was because it was

14   part of the complaint.

15       Q.    Got you.  All right.  So what we're going

16   to do is mark this as Exhibit Number 3 to your

17   deposition.  I'm going to show you here, have you

18   ever seen that document before, sir?

19            (Defendants' Exhibit 3 was marked for

20        identification.)

21       A.    It's possible.

22       Q.    Okay.

23       A.    And I only say that because I'm looking

24   at her -- I remember seeing her signature, Sarah's

25   signature before, which is very different from the

```
1    signature that was on her petition for bankruptcy.

2    So I do remember seeing it, whether it was on this

3    document or not I don't know, but --

4        Q.   Can you please repeat what you just

5    testified to again, please?  Did you just testify

6    to the fact that the signature here you see of

7    Sarah is different than the signature on her

8    bankruptcy petition?

9        A.   I believe so.

10       Q.   And how do you have that knowledge and

11   are you a handwriting expert?

12       A.   I am not, but I have two eyes and I

13   remember seeing her signature on something and

14   it's possibly this, I don't know, and when I saw

15   her bankruptcy I remember having something that

16   had her signature on it and I looked at the two

17   and it did not look the same to me.

18       Q.   Okay.

19       A.   Or similar.

20       Q.   Well, but this document was actually

21   notarized, correct?

22       A.   Yes.

23       Q.   And is there any reason to believe that

24   because it was notarized by somebody who produced

25   a Florida driver's license as identification, that
```

1      this is not in fact Sarah Sussman's signature?

2          A.    I have no reason to doubt this isn't her

3      signature.

4          Q.    Okay.  And up at the top it shows it was

5      recorded in the official records of Hillsborough

6      County, correct?

7          A.    Yes, correct.

8          Q.    Okay.  Can you read for the record the OR

9      book and page number?

10         A.    The book number and the page number?

11         Q.    Yes.

12         A.    It looks like the book number is 25302,

13     looks like the page is 274 to 276.

14         Q.    Okay.  And what was the date of this

15     filing?

16         A.    It looks like October 18.

17         Q.    Of what year?

18         A.    2017.

19         Q.    Okay.  And when was it executed by the

20     Notary who certified the signature?

21         A.    Looks like September 13.

22         Q.    Okay.  Also, what year?

23         A.    2017.

24         Q.    Thank you.  So this was recorded in the

25     official records on October the 18th and you

1    reviewed everything on October the 24th, right?

2        A.    Everything that I reviewed, yes.

3        Q.    Okay.  And you don't recall reviewing

4    this notice of homestead?

5        A.    It's possible.  Like I said, I don't

6    remember everything I reviewed.  I don't know if I

7    went outside the civil case.  Like I said, I did

8    see something with her signature on it because I

9    remember when I saw the bankruptcy I noted that,

10   but I couldn't tell you if it was a notice of

11   homestead or something else that had her signature

12   on it.

13       Q.    Even though you looked at everything had

14   you seen this notice of homestead, okay, would you

15   still have made the recommendation that the

16   eviction should go through prior to a court making

17   a determination it's not the homestead allowing

18   you to go through with the Writ of Possession?

19            MR. KANGAS:  Object to form.

20       A.    I think in this hypothetical I probably

21   would have done more research into that.

22       Q.    Okay.

23       A.    Had I seen this.

24       Q.    Okay.

25       A.    Or had an attorney called me and told me

1    about these -- these issues.

2        Q.    Well, then let me ask you this.  Then in

3    your -- in your research, okay, obviously going

4    through the case file is one thing, but if you're

5    looking up deeds to property and other things

6    wouldn't it be more prudent to conduct proper due

7    diligence by actually going to the official

8    records to make sure that whatever you're

9    reviewing is the actual document that should

10   control?

11            MR. KANGAS:  Object to form.

12       A.    I think I did do my proper due diligence

13   in this.

14       Q.    Oh.  Did you look at the deed that came

15   from the official records?

16       A.    The deed going to the family trust?

17       Q.    Yes.

18       A.    Again, I don't know.  It's possible I

19   did.  I know I saw the deed.  Again, I don't know

20   if I saw it through the property appraiser, tax

21   appraiser, something like that or through the

22   clerks office, or if saw it as part of the

23   complaint, but I do know I saw it.

24       Q.    But wouldn't you think that you would --

25   I understand you said you did your due diligence,

1    but wouldn't it be more prudent to check the
2    official records to see if there was anything like
3    a notice of homestead that was filed?
4         A.    Again, I may have.  I don't remember.
5         Q.    And let's say you did.  You did, you
6    reviewed it and you didn't find it was relevant or
7    it controlled, correct?
8              MR. KANGAS:  Object to form.
9         A.    To me what was controlling was the court
10   orders and the case, referring back to the
11   complaint, the writ and then comparing all that to
12   what was filed in bankruptcy court.
13        Q.    Okay.  Which was the fact that Sarah
14   Sussman filed for bankruptcy?
15        A.    Correct, as an individual.
16        Q.    Okay.  And can you provide a legal
17   opinion as to why?  Just because she filed as an
18   individual it would not protect property that she
19   has as her homestead, even though she's the
20   trustee of that property?
21             MR. KANGAS:  Object to form.
22        A.    Again, as I stated before, that property
23   was already taken and given back to the estate,
24   per the court, and in the civil case.
25        Q.    By an order, correct?

```
 1        A.    By an order and then also Writ of
 2   Possession was then thereafter provided --
 3        Q.    Okay.
 4        A.    -- by the court.
 5        Q.    In order to transfer real property, okay,
 6   can a court order do that or do you have to have a
 7   final judgment?
 8              MR. KANGAS:  Object to form.
 9        A.    I'm not a real estate transaction lawyer.
10        Q.    So if the Civil Process Section called
11   you on this and wanted your recommendation, okay,
12   would you have done that research to make that
13   determination to know whether or not that could
14   have been a valid transfer of the real property?
15              MR. KANGAS:  Object to form.
16        A.    I'm sorry, what research?
17        Q.    The fact that a court order can actually
18   transfer title to real property as opposed to a
19   final judgment being necessary?
20              MR. KANGAS:  Object to form.
21        A.    I did the research I did.  I don't --
22   I'm -- I don't know how better to answer your
23   question.  Because, I mean, hypotheticals about --
24        Q.    No, I'm trying to --
25        A.    -- I can tell you what I did do.
```

1          Q.    And that's what I'm trying to get to is

2     your research.  Okay?

3          A.    Okay.

4          Q.    So did you do your research to determine

5     whether or not it was valid for a court order to

6     make to a transfer of real property and did you

7     research whether or not a final judgment is

8     required to transfer the real property?

9          A.    I don't believe I did that research.

10         Q.    You did not, okay.  Thank you.

11               All right.  Did you do research as far as

12    what is the significance of a bankruptcy?

13         A.    The affect of a bankruptcy or a

14    suggestion of bankruptcy?

15         Q.    All right.  Let's start with the

16    suggestion of bankruptcy.

17         A.    I mean, I'm familiar with what those are.

18    I've seen them in other cases.

19         Q.    Then what is it, to your knowledge?

20         A.    It's letting the civil court or the

21    Thirteenth Circuit, the judge in the Thirteenth

22    Circuit know that a bankruptcy has been filed in

23    bankruptcy court.

24         Q.    Okay.

25         A.    In the middle of that case.

1    Q.    And so once you see one of those you know
2    that there is now an active bankruptcy case?
3    A.    Correct, which leads us to go look at the
4    bankruptcy.
5    Q.    Okay.
6    A.    To verify that it's active and still
7    exists, is still current and open and then in this
8    case is what led me to go look into the bankruptcy
9    case.
10    Q.    And based upon your knowledge and
11    experience here, once you are aware that there's a
12    bankruptcy you are -- are you aware of the
13    automatic stay that's in place?
14    A.    Yes.
15    Q.    Okay.  In regards to the automatic stay
16    and in regards to this specific case what
17    specifically, and I think you did earlier pull out
18    or reference the statute so you have the statute
19    with you; is that right?
20    A.    The automatic stay statute?
21    Q.    Yes.
22    A.    Correct.
23    Q.    Okay.  Can you cite for me what specific
24    paragraph in there you relied upon to make your
25    recommendation that the automatic stay was not in

1    place in this specific case?

2    A.   I think did before, that in my opinion --

3    and, again, we can sit here and argue all day

4    about it -- I'll just give you my answer --

5    Q.   And that's what I want.

6    A.   -- as I did that day.  In my opinion that

7    house was not part of Sarah Sussman's estate as

8    going into the bankruptcy, so it was not part of

9    the estate.  Which was at the beginning of the

10    statute that I think I already -- we talked about

11    earlier.

12         Additionally, when I also looked at her

13    bankruptcy, her voluntary petition, it talks about

14    she really has no debt or no creditor, the only

15    thing she relies upon for the reason for filing

16    the bankruptcy was a civil action, and she put it

17    as a mortgage foreclosure.  When I looked back to

18    14-CA, I think it's --

19    Q.   Eleven --

20    A.   No, the civil case number that was not a

21    mortgage foreclosure case.

22    Q.   Okay.

23    A.   So I don't know if she has another home

24    that she's trying to protect from a mortgage

25    foreclosure or not because that's what she cites

1    to, what she's looking for protection from is a

2    mortgage foreclosure.  That clearly was not what

3    was going on in the civil case with this house.

4        Q.   Well, but the specific address was listed

5    in her petition for bankruptcy, correct?

6            MR. KANGAS:  Object to form.

7        A.   I understand.  And I also understand that

8    I looked her up and found that she'd been living

9    in D.C. for awhile and working in D.C. for awhile,

10   which is also why Corporal Harris went out there

11   just to add a layer of protection.  I asked him to

12   find out if she was there or not, to which

13   Mr. Sussman first said, she hasn't been there in

14   quite sometime or however he worded it.  I don't

15   have the exact phrase, but, you know, it was her

16   bankruptcy, it would have been her protection.

17   However, she wasn't -- to my understanding she

18   wasn't even living there.

19       Q.   Well, but just because she wasn't living

20   there does that mean it's not her homestead

21   property?

22           MR. KANGAS:  Object to form.

23       A.   Well, I think we should go back to it

24   wasn't her property to begin with through the

25   court order in the civil case, was my thought

1    process.

2        Q.    And it was a court order you relied upon,

3    not a final judgment?

4        A.    I believe it was a court order.

5        Q.    Okay.  All right.  Now because you had

6    been called by Michele Polk on the 25th or the

7    24th in the afternoon, I believe it was -- or the

8    23rd in the afternoon --

9        A.    Correct.

10       Q.    -- you did all your research on the 24th.

11   What did you do then on the 25th when the eviction

12   was actually taking place, were you present there?

13       A.    No.

14       Q.    Okay.  Do you know who was present there

15   on behalf of the Hillsborough County Sheriff's

16   Office?

17       A.    I believe, and -- I believe it was -- I

18   know it was Corporal Harris.  I believe he was

19   with Deputy Carlton, if I'm not mistaken.

20       Q.    Was anybody else there on behalf of the

21   Hillsborough County Sheriff's Office?

22       A.    Not to my understanding.

23       Q.    Okay.  So you said Corporal Harris and

24   Deputy who?

25       A.    I believe it was Carlton, I believe was

1    also there.

2        Q.    Okay.  Who would have knowledge of

3    exactly who was there on the day of the eviction?

4        A.    I would imagine Corporal Harris.

5        Q.    All right.  Who assigns the corporal --

6    let me strike that.

7            When an eviction -- when a Writ of

8    Possession is being executed by the Hillsborough

9    County Sheriff's Office what is the standard

10   operating procedure as far as who is sent out?

11       A.    I have no idea.

12       Q.    Who would have that knowledge?

13       A.    Sergeant Polk.

14       Q.    Okay.  Do you have knowledge as to

15   whether or not there's always a corporal and a

16   deputy assigned to each executing a Writ of

17   Possession?

18       A.    I don't know.

19       Q.    Okay.  Who would have that knowledge?

20       A.    I would imagine Sergeant Polk.

21       Q.    Okay.  Who would have been the one to

22   assign to Corporal Harris and Corporal Carlton to

23   this specific eviction on the 25th?

24            MR. KANGAS:  Object to form.

25       A.    I don't know if it's a particular -- if

```
 1    she hands out assignments in particular or I
 2    believe, if I'm not mistaken, I believe they have
 3    their own zones so any eviction that occurs within
 4    their zone is handled by those deputies, those
 5    corporals.
 6        Q.   Okay.  So the corporals have their own
 7    zones?
 8        A.   I believe so.
 9        Q.   Okay.  And, well, you believe so.  Who
10    would have the most knowledge of that?
11        A.   I would say Sergeant Polk and Corporal
12    Harris.
13        Q.   Okay.
14        A.   I think any of them can answer that
15    question.
16        Q.   Any one of the corporals or --
17        A.   I think even the deputy probably knows if
18    he has assigned those zones or not.
19        Q.   Okay.  All right.  And were you contacted
20    on the 25th by anyone from the Hillsborough County
21    Sheriff's Office with regards to this eviction
22    when it was taking place?
23        A.   While it was taking place?
24        Q.   Well, during that entire day.
25        A.   In the morning, I told you already I
```

```
1    spoke to Sergeant Polk when she called me and told
2    me that an attorney may be calling me --
3         Q.    Right.
4         A.    -- and I said that's fine.
5         Q.    Okay.
6         A.    And then I believe I spoke to Corporal
7    Harris when he was out there, which is the
8    conversation about whether Sarah was there or not.
9         Q.    Okay.
10        A.    Other than that I don't recall speaking
11   to anybody else.
12        Q.    All right.  Okay.  Did you speak to
13   anybody involved with the eviction outside of the
14   Hillsborough County Sheriff's Office, either
15   Mr. Kangas, Mr. Baumann, Mr. Sussman, Ms. Gaffney?
16        A.    On the 25th?
17        Q.    On the 25th, yes.
18        A.    Not that I remember, no.
19        Q.    Okay.  So the only conversations on the
20   25th in regards to this eviction were with
21   Sergeant Polk in the morning and then Corporal
22   Harris while he was on the property?
23        A.    And it's possible I may have talked to
24   Sergeant Polk again later that day.
25        Q.    Okay.
```

```
 1         A.    Just after it was done, just to ensure it
 2    was done --
 3         Q.    Right.
 4         A.    -- and everything was fine.
 5         Q.    All right.  When you completed your
 6    research, okay, on the 24th what did you do to
 7    notate the file as far as your decision?
 8              MR. KANGAS:  Object to form.
 9         A.    As far as what file?
10         Q.    The eviction file.  Like, in other words,
11    how does Corporal Harris and Corporal Carlton know
12    they have the green light to go through and --
13         A.    Because I called Sergeant Polk that --
14         Q.    Okay.
15         A.    -- after work that day --
16         Q.    Okay.
17         A.    -- because, I know it was after work when
18    I called her.
19         Q.    Okay.
20         A.    So I called her and let her know.  This
21    was after five when I called her and then she
22    would let them know the following day.
23         Q.    All right.  But there's no written
24    report, there's nothing that you did to notate the
25    file as far as your recommendation and the basis
```

1    for your recommendation?

2        A.    I mean, I keep my own personal notes but

3    other than that, no.

4        Q.    All right.

5        A.    There's not going to be an official

6    report.

7        Q.    Okay.  And I don't want your work

8    product, okay, but other than your work product

9    that you did and turned into the Hillsborough

10   County Sheriff's Office is there anything that you

11   have that would be notated in the file that the

12   records custodian would be producing in regards to

13   your decision to recommend that the writ of

14   possession go forward?

15           MR. KANGAS:  Object to form.

16       A.    Not that I can think of.

17       Q.    No?  Okay.

18           When the deputies -- Corporal Harris and

19   Deputy Carlton showed up at the property on Clark

20   Avenue on the 25th were they in uniform?

21       A.    I have no idea, I wasn't there.

22       Q.    Okay.

23       A.    I would imagine.

24       Q.    Is it customary that they would be in

25   uniform?

```
 1          A.    I would imagine.
 2          Q.    Okay.  Is there a time where you would
 3    imagine they would not be in uniform?
 4                MR. KANGAS:  Object to form.
 5          A.    I have no idea.
 6          Q.    Okay.  Have you ever, yourself, been
 7    present when some of your deputies have executed a
 8    writ of possession?
 9          A.    No.
10          Q.    Never?  In your -- because you've been
11    with the Hillsborough County Sheriff's Office for
12    18 years, minus four to five months?  Or, no, I
13    take that back.  I take that back.  You were three
14    years with the AG's Office, right?
15          A.    I've been there --
16          Q.    I'm sorry?
17          A.    I was with the AG's Office two-and-a-half
18    years.
19          Q.    Two-and-a-half, okay, and then four or
20    five months with the --
21          A.    Law firm.
22          Q.    -- law firm, in other words.  So we're
23    talking 15 years, right, approximately?
24          A.    16 -- yeah, something in there.
25          Q.    Or 16, that's fine.  So you've been there
```

```
 1      approximately 16 years.  You've never once gone
 2      and been present during an eviction to see how it
 3      works?
 4           A.    Not that I can remember.
 5           Q.    Okay.  You previously testified that
 6      you'd spoken to Mr. Kangas back in December to let
 7      you know that your deposition wasn't going
 8      forward.  Tell me about that conversation.
 9      Exactly what was talked about?
10           A.    I think I said it was an e-mail.
11           Q.    It was an e-mail?
12           A.    I believe so.
13           Q.    Okay.  So he sent you an e-mail?
14           A.    Correct.
15           Q.    Do you know if he copied anybody else in
16      that e-mail?
17           A.    I don't remember.
18           Q.    Okay.  Did you have any other
19      conversations with him?
20           A.    Back in December?
21           Q.    No.  Let's say -- let's say beginning
22      January 1, just as you sit here today, have you
23      had any conversation with Mr. Kangas?
24           A.     I think there may have been another
25      e-mail about whether it was going to be taking
```

1    place in January, again, because I think there was

2    some discussion that it might get reset in January

3    at some time.  And then I think when I got served

4    with this one I believe I sent him an e-mail about

5    a week or so ago just asking if this one was still

6    set or if there was something going on in the

7    courts that it was not going to take place back in

8    December.

9        Q.    Was the subpoena you received from

10   Mr. Kangas?

11       A.    No, it was from Mr. Sussman.

12       Q.    Why would you not contact Mr. Sussman to

13   ask him whether or not his deposition is going to

14   go forward?

15       A.    Well, I assume if I'm getting a

16   deposition -- getting a subpoena I'm going forward

17   in the deposition.

18       Q.    Then why would you ask Mr. Kangas if it

19   was going forward?

20       A.    He's the person that told me in the past.

21   Mr. Sussman never told me -- I would have shown up

22   in December had it not been for Mr. Kangas, so why

23   would I trust Mr. Sussman now?

24       Q.    Well, you were served for your deposition

25   in December, were you not?

```
 1        A.    I'm trying to remember if I received the
 2   actual service.  Because I remember there was
 3   another time that I got an e-mail for a
 4   deposition.  I don't know if I got served for the
 5   December one.  I may have just gotten some e-mail.
 6        Q.    Well, let me ask you though.  You were
 7   served for this deposition and you're sitting here
 8   today?
 9        A.    Correct.
10        Q.    Okay.  Was there an occasion where you
11   were served previously at another time for
12   deposition?
13        A.    That's what I'm trying to remember.  If
14   it was personal serve -- proper personal service
15   like this one, I don't recall.  I remember at
16   least one other occasion, and I don't remember if
17   the December one was that or it was a different
18   one where I just got an e-mail from Mr. Sussman
19   with a subpoena attached to it.
20        Q.    Okay.
21        A.    So that's why I'm saying, I don't
22   remember if December was a proper service.
23        Q.    Well, if you felt it wasn't proper
24   service why did you have to ask another attorney?
25   You're an attorney yourself, correct?
```

```
 1        A.    Correct.

 2        Q.    Why would --

 3        A.    And maybe it wasn't proper service.

 4   Maybe it was in October, I don't know.

 5        Q.    Okay.

 6        A.    I didn't bring them all with me, so I

 7   don't remember.

 8        Q.    I'm just asking, I wanted your

 9   recollection because I don't have them here --

10        A.    Yeah.

11        Q.    -- so I understand.

12        A.    I couldn't tell you --

13        Q.    Okay.

14        A.    -- if I got a proper service in December

15   or not.  I know there was a time that I got an

16   e-mail about a deposition with a subpoena attached

17   to it.  Again, I couldn't tell you if that was for

18   the December one or a prior one, I just -- as I

19   sit here, I don't have them with me.

20        Q.    Well, didn't the request here ask for any

21   correspondence that you had with Mr. Kangas and

22   wouldn't that fall in one of these categories

23   here?  You didn't bring that here today?

24        A.    Well, mine was -- when I looked at mine,

25   the cover of it, it was a subpoena for deposition
```

1    and there was no production marked off on it.

2    Now, I understand that you're going to tell me

3    that there's other pages behind it, but that was

4    also what was the service to the records section.

5        Q.    Okay.  So did you provide those e-mails

6    that you had received from Mr. Kangas in regard to

7    your deposition to the records section to be

8    produced here today?

9        A.    No, because they were pulling everything.

10            My other problem with e-mails to and from

11   Mr. Kangas that I've had over time is I don't know

12   what's his work product or attorney/client

13   privilege, you know, and I don't know what's in

14   e-mails that may be my own work product or

15   attorney/client privilege, as well.  So --

16       Q.    Did you file a privilege log?

17       A.    I have not.

18       Q.    Did you object to any of the requests?

19       A.    I have not.

20       Q.    Okay.  How would it be that a

21   communication between you and another attorney be

22   considered work product?

23       A.    Again, my understanding was as I came to

24   this, this was just for a deposition.  So I wasn't

25   so concerned with bringing my own documents

1    knowing that the records section was dealing with
2    bringing documents.
3        Q.   But if the records section is bringing
4    documents can you certify for the fact that those
5    communications that you're talking about are
6    included, and if they're not included that there's
7    either a proper objection or a privilege log
8    that's filed that accompanies this?
9        A.   Well, I'd have to see what they are to
10   know if there's going to be a proper objection or
11   privilege.
12       Q.   You haven't reviewed what they gave you
13   here today?
14       A.   They haven't given anything yet because
15   they need clarification before they go grabbing
16   everything.
17       Q.   Okay.  So in other words, nothing is --
18   they have not fully complied because they have
19   questions and they don't know how to proceed.  Is
20   that a fair interpretation of it?
21       A.   Well, not the way you worded it but
22   they're trying to comply.
23       Q.   Okay.
24       A.   But they're asking for clarification so
25   that they can comply with it.

```
 1          Q.    Uh-huh.  All right.  I'm going to shift
 2    gears here back to some other stuff here.
 3               We talked a little bit about the
 4    homestead and all that kind of stuff.  Have you
 5    ever had an occasion where there's been a writ of
 6    possession issued and it is someone's homestead
 7    property and there's been a suggestion of
 8    bankruptcy filed and you've had to go to a court
 9    to make a determination as to whether a writ can
10    proceed or not proceed?
11               MR. KANGAS:  Object to the form.
12          A.    We are a disinterested party.  I let the
13    parties handle the court proceedings and any
14    motions to stay evictions, anything like that.
15    That's between the parties, not us.  That's not
16    for us to be going and filing pleadings in someone
17    else's case.
18          Q.    Okay.  All right.
19               MR. MCMULLEN:  Am I on number four?
20               (There was a discussion off the record.)
21               MR. SUSSMAN:  Yeah, four it is.
22               (Defendants' Exhibit 4 was marked for
23         identification.)
24    BY MR. MCMULLEN:
25          Q.    I'm going to show you what is the Writ of
```

```
 1      Possession --

 2          A.    Okay.

 3          Q.    -- that was filed in the court case of

 4      3762.  Do you recall ever seeing that document

 5      before?

 6          A.    I do.

 7          Q.    Does that look like the document that you

 8      reviewed when making your determination on the

 9      24th?

10          A.    It looks like it.

11          Q.    Okay.  And that's the document that came

12      from the order that you're talking about, correct?

13          A.    It came after the order.

14          Q.    Okay.

15          A.    I believe the order was about a month

16      prior to this, I want to say.  I believe the order

17      was in September that I saw.

18          Q.    Okay.  And do you recall what that order

19      was?

20          A.    It had to do with the default.  It was an

21      order of default of some kind.

22          Q.    Okay.

23          A.    If I'm not mistaken.

24          Q.    All right.  Now in regards to the

25      Hillsborough County Sheriff's Office --
```

```
 1         A.    Do you need that back?

 2         Q.    Oh, yeah.  I'll make sure she gets them

 3    here.

 4               The Hillsborough County Sheriff's Office

 5    has standard operating procedures, right?

 6         A.    Correct.

 7         Q.    And the ones that you guys have developed

 8    based upon certain circumstances that you're going

 9    to want to have certain guidelines on how to do

10    certain things, right?

11               MR. KANGAS:  Object to form.

12         A.    It's very broad, general guidelines.

13         Q.    Okay.

14         A.    Because so you can't make an SOP that

15    covers every situation that's ever going to come

16    up.

17         Q.    Okay.  Is there any SOPs that deal

18    specifically with the Civil Process Section?

19         A.    Yes.  And I brought one that was -- that

20    applies to item number 73, which is Civil Process

21    Section, forcible writs.  It's SOP 92409.

22         Q.    Okay.  I don't want to get out of place

23    here all the stuff you're going to be giving him

24    as the records custodian.  As long as we get back

25    to it I'm probably going to want to get a copy
```

```
 1    made --
 2         A.    Absolutely.
 3         Q.    -- and attach this to your depo because I
 4    want to ask you some questions.
 5         A.    Yeah.  And I think I have been keeping
 6    everything in.
 7         Q.    If we could, one quick thing, though, I'm
 8    going to ask you, the sticky here --
 9              MR. MCMULLEN:  Do you have a -- that's
10         not the same one.
11              MR. SUSSMAN:  I have a copy.
12              MR. MCMULLEN:  That's a different one.
13              MR. KANGAS:  That's a different one.
14              THE DEPONENT:  That's the economic crimes
15         one.
16              MR. MCMULLEN:  That's the EC one.
17    BY MR. MCMULLEN:
18         Q.    So in regards to that, where does it -- I
19    understand you say Item Number 73 which referenced
20    the actual subpoena duces tecum, the specific
21    numbered paragraph.  What is the I A at the top of
22    that?
23         A.    I have no idea.  It's not -- I didn't
24    write the sticky.
25         Q.    Okay.
```

```
1        A.    So --

2        Q.    So whoever prepared these records wrote

3    the notation "I A"?

4        A.    Yep.

5        Q.    And you have no idea what that signifies?

6        A.    No.   References the Item Number 73.

7        Q.    Okay.  All right.

8              MR. MCMULLEN:  Can we make a copy of that

9        real quick?  And we'll do that as number five

10       to the deposition.

11             (Defendants' Exhibit 5 was marked for

12       identification.)

13   BY MR. MCMULLEN:

14       Q.    So what we marked here, Exhibit Number 5

15   to your deposition, this is the standard operating

16   procedure for the Civil Process Section for

17   enforceable writs?

18       A.    Correct.

19       Q.    Okay.  I'm going to direct you to

20   paragraph Roman Numeral IV C.

21       A.    Okay.

22       Q.    Okay?  So as far as the procedure goes,

23   when you're given a writ of possession this is

24   kind of your guideline of what you're supposed to

25   do, correct?
```

```
 1          A.    It's just a -- when you look at this it
 2     kind of just describes what each writ is.
 3          Q.    Okay.  All right.  Do you see in there
 4     where it talks about the court issuing the
 5     judgment for the writ to the sheriff in paragraph
 6     C, IV C?
 7          A.    "An order requiring the sheriff to remove
 8     the defendant from the premises described in said
 9     writ and to place the plaintiff or his agent in
10     full possession thereof.  In the proceedings for
11     the removal of the tenant, if the plaintiffs -- if
12     the plaintiff possession of the premises, the
13     Clerk of the Court issuing such judgment shall
14     issue a writ to the sheriff describing the
15     premises and commanding him to put the plaintiff
16     in possession."
17          Q.    Okay.
18          A.    Okay.
19          Q.    Anywhere in there does it mention the
20     word order?
21          A.    It does.
22          Q.    Where?
23          A.    At the very top.  An order requiring the
24     sheriff to remove the defendant.
25          Q.    Okay.  So based upon this the sheriff's
```

1     office, your procedures would allow for an order

2     as opposed to a judgment?

3       A.    Well, really we're looking at the Writ of

4     Possession, is what we're really relying upon.

5       Q.    Okay.

6       A.    To be honest with you.

7       Q.    So once a Writ of Possession is issued

8     you don't necessarily have to look back from that?

9       A.    In a typical sense when I'm not called,

10     no.  If there's disputes going on or back and

11     forth going on that they need to call me, that's

12     when --

13       Q.    Okay.

14       A.    -- we start digging a little bit further.

15       Q.    And in this specific case if you can tell

16     me -- I mean, I understand if there's work product

17     internally with the Hillsborough County Sheriff's

18     Office, what was the specific issue that you were

19     asked to look into?

20       A.    My understanding, if I remember

21     correctly, was when Ms. Gaffney called Sergeant

22     Polk the day it was posted, I believe the 23rd, I

23     believe it said on the --

24       Q.    Yeah, the 23rd in the morning.

25       A.    Right.  That afternoon when Sergeant Polk

1    called me, which I believe was Monday, apparently

2    Ms. Gaffney had called her about the writ and told

3    her that she would be filing and I think she

4    said -- I forgot how she worded it to Sergeant

5    Polk, but led her to believe that a bankruptcy was

6    being filed --

7         Q.    Okay.

8         A.    -- the following the day.  Then the

9    suggestion of bankruptcy was filed in the civil

10   case and when I heard that from Sergeant Polk and

11   saw the suggestion of bankruptcy that's what led

12   me to go find the bankruptcy itself.

13        Q.    Okay.

14        A.    To see exactly what was filed.

15        Q.    So your office was provided a copy of the

16   suggestion of bankruptcy?

17        A.    I don't know if I received it from anyone

18   or if I got it from the court file.

19        Q.    Either way you were now in possession of

20   it and had knowledge of it?

21        A.    Correct.

22        Q.    Okay.  All right.  And, again, I'm not

23   trying to, you know, go back too far, but based

24   upon your research you determined that the court

25   order divested all right, title and interest in

1    the property from Sarah Sussman giving it back to

2    the estate and because her bankruptcy was in her

3    name individually and not as trustee of the trust,

4    the automatic stay would not apply?

5         MR. KANGAS:  Object to form.

6    A.    Well, I mean, do you want me to say all

7    my answer again?  I mean, I don't know if you

8    included it all.

9    Q.    Well, if I didn't include it then correct

10   it so we make sure we have a complete answer.

11        MR. KANGAS:  Asked and answered.

12   A.    Yeah.  Quite frankly the order gave the

13   relief in the complaint.  So I went back and

14   looked at the complaint and looked at the order.

15   Then there was the Writ of Possession.  I saw

16   nothing in the file undoing the Writ of

17   Possession.  I saw motions filed on behalf of the

18   Gaffney's, Sussman, the defendants, that had all

19   been struck by Judge Barbas.  So there was nothing

20   indicating to me that Judge Barbas wanted to stay

21   the execution.

22        Then when I went back and looked at the

23   bankruptcy, compared it to the deed it was, again,

24   Sarah Sussman as an individual filing bankruptcy

25   versus the deed which showed it going to the

1    trust.   The trust, which had lost possession of

2    the property in the case back in, I believe it's

3    in September, and then the Writ of Possession was

4    done in October.

5           Additionally I looked at the bankruptcy,

6    as well.   The bankruptcy referenced the mortgage

7    foreclosure action, which this case that I was

8    looking at was not.   Also, the Writ of Possession

9    was to remove all persons and that bankruptcy was

10   only as to Sarah Sussman as an individual, not the

11   trust, not Mr. Sussman, not Teresa Gaffney.   So

12   I'm looking a Writ of Possession to remove all

13   persons.   Mr. Sussman and Ms. Gaffney are all

14   persons who have not filed bankruptcy either.

15          Nonetheless, irregardless of all that I

16   did not feel that that house was part of any of

17   their estate at that point in time because of what

18   had happened in the civil case and because of all

19   the things that had occurred between that order,

20   the Writ of Possession and Judge Barbas denying

21   all requests from the defendants in that case.

22   Q.   And in your answer I didn't hear you

23   mention anything about homestead, it being

24   homestead property of Sarah Sussman?

25   A.   I think I already answered that

1    previously.

2        Q.   Okay.  All right.  At the time you did

3    your research did you confer with any of the other

4    inhouse attorneys?

5        A.   No.

6        Q.   Okay.  As far as the legal department at

7    the Hillsborough County Sheriff's Office, is there

8    a hierarchy there?  In other words, do you report

9    to anybody?

10       A.   At the time our chief legal counsel would

11   have been Thea Clark.

12       Q.   Okay.  And are you required to provide

13   her -- strike that.

14            When making decisions in regards to Writs

15   of Possession and other things when you're making

16   legal recommendations are you required to get

17   approval from Ms. Clark or whoever it is now,

18   prior to them being carried out?

19       A.   On every occasion?  No.

20       Q.   Okay.

21       A.   I mean, if there's something that's just

22   completely off the wall or unusual maybe I'll go

23   to talk to her or someone else about it.  But, no,

24   there's nothing in place that I have to go talk to

25   her every time I do anything.

```
 1          Q.    Do you know whether or not she was aware
 2    of this particular eviction?
 3          A.    Prior to or after?
 4          Q.    Let's take it in two parts.  Prior to it
 5    happening?
 6          A.    I don't believe so.
 7          Q.    Okay.  And after it happened?
 8          A.    Yes.
 9          Q.    Do you know when she became aware?
10          A.    It would have been the days after.
11          Q.    Okay.  Do you know how she became aware?
12          A.    I told her.
13          Q.    You did?
14          A.    Yes.
15          Q.    Okay.  Are there any memos or notes that
16    the file has in regards to any internal meetings
17    or communications in regards to this specific
18    eviction?
19                MR. KANGAS:  Object to form.
20          Q.    And I don't want to know the substance of
21    them, I just want to know if there was some?
22          A.    You mean, like my own personal notes?
23          Q.    No.  Just HCSO in general on this
24    specific file, whether or not there was
25    internal --
```

```
 1          A.    Not that I'm aware of.

 2          Q.    Not that you're aware of.  Okay.

 3                When did Ms. Clark leave the Hillsborough

 4    County Sheriff's Office?

 5          A.    She retired just before Christmas.

 6          Q.    Okay.

 7          A.    2018.

 8          Q.    All right.  And I understand Mike

 9    Parody's in that position now?

10          A.    Actually it's being interviewed for right

11    now.  They're looking for a replacement as we

12    speak.

13          Q.    Okay.  So there isn't anybody as far

14    as -- is he interim?

15          A.    No.  I think I'm kind of acting as

16    interim at the moment.

17          Q.    You are?

18          A.    Yes.

19          Q.    Okay.  Okay.  Was that something that's

20    kind of official from Mr. Chronister?

21          A.    What do you mean?

22          Q.    Like, as far as being named interim while

23    they're doing the process?

24          A.    I was named acting deputy chief in the

25    last two months she was here.  That's when it was
```

```
 1    announced she left so I'm still acting deputy
 2    chief, but they are currently looking to fill the
 3    position of chief legal.
 4        Q.   Okay.
 5        A.   So there's no, I guess, interim chief
 6    legal as far as title goes, I'm the acting deputy
 7    chief.
 8        Q.   Okay.  All right.  I don't believe I have
 9    anything else.
10            MR. MCMULLEN:  Do you want to --
11            MR. SUSSMAN:  No.
12            MR. MCMULLEN:  No?
13            MR. SUSSMAN:  No.
14            MR. MCMULLEN:  All right.  I don't have
15       any further questions for you right now.
16            MR. KANGAS:  I don't have anything.
17            MR. MCMULLEN:  Okay.
18            THE DEPONENT:  I'll read.
19        (The deposition concluded at 12:25 p.m.)
20
21
22
23
24
25
```

120

```
1                        CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF HILLSBOROUGH

5

6            I, the undersigned authority, certify that

7    JASON GORDILLO personally appeared before me and was

8    duly sworn.

9

10

11           WITNESS my hand and official seal this

12   date:  March 20, 2019

13

14

15

16

17                      Beth A. Malone

18                      BETH A. MALONE
                        Notary Public
19                      State of Florida
                        My Commission Expires 9/03/19
20                      Commission No. EE-123546

21

22

23

24

25
```

121

```
1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF HILLSBOROUGH

5

6            I, BETH A. MALONE, Court Reporter, certify

7    that I was authorized to and did stenographically

8    report the foregoing deposition; that a review of the

9    transcript was requested, and that the transcript is

10   a true record of the testimony given by the witness.

11

12           I further certify that I am not a relative,

13   employee, attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the

15   parties' attorney or counsel connected with the

16   action, nor am I financially interested in the

17   action.

18

19           Dated:  March 20, 2019

20

21

22

23                       Beth A. Malone

24                       BETH A. MALONE
                         Court Reporter
25
```

```
 1                           ERRATA SHEET

 2     To be attached to deposition of JASON GORDILLO,
       taken February 22, 2019, in the case of ESTATE OF
 3     JOHN J. GAFFNEY vs TERESA GAFFNEY, ET AL.
       ------------------------------------------------------
 4     INSTRUCTIONS:  Please read this certified transcript
       of your deposition and make note of any errors in
 5     transcription and the reason for same on this page.
       Do not mark on the transcript itself.  Sign and date
 6     this sheet.  Then return this sheet to the court
       reporter.  Thank you.
 7         (COUNSEL:  Please attach the completed Errata
       Sheet to your copy of the transcript.)
 8
       PAGE  LINE ERROR OR AMENDMENT and REASON FOR CHANGE
 9
       ----  ---- -----------------------------------------
10
       ----  ---- -----------------------------------------
11
       ----  ---- -----------------------------------------
12
       ----  ---- -----------------------------------------
13
       ----  ---- -----------------------------------------
14
       ----  ---- -----------------------------------------
15
       ----  ---- -----------------------------------------
16
       ----  ---- -----------------------------------------
17
       ----  ---- -----------------------------------------
18
       ----  ---- -----------------------------------------
19
       ----  ---- -----------------------------------------
20
       ----  ---- -----------------------------------------
21
       Under penalties of perjury, I declare that I have
22     read my deposition and that it is true and correct,
       subject to any changes in form or substance entered
23     here.

24
       _____          _____
25       DATE                        JASON GORDILLO
```

# PLAINTIFF'S

# EXHIBIT "B"

THIS IS NOT A
CERTIFIED COPY

## NOTICE OF HOMESTEAD (Page 1 of 3)

**TO:**

**In Re: NOTICE OF HOMESTEAD**

You are notified that the undersigned claims as homestead exempt from levy and execution under Section 4, Article X of the State Constitution the following described property:

**ALL OF Lot 30 and the South 31 feet of Lot 29 of KENTEL PARK SUBDIVISION, as per map or plat thereof recorded in Plat Book 12 on Page 66 of the Public Records of Hillsborough County, Florida.**

The undersigned certifies, under oath, that the *lis pendens* filed by you, in derogation of *Fla.Stat.817.535*, on 10 April 2014 and recorded in Official Records as Instrument 2014123418, Book 22518, Pages 1056-1057, of the Public Records of Hillsborough County, State of Florida, does not constitute a valid *lis pendens* on the described property.

Signature of Sarah K. Sussman, in her capacity as Trustee of the Sussman Family Trust

Printed Name of Sarah K. Sussman, in her capacity as Trustee of the Sussman Family Trust

119 S Clark

Address of Sarah K. Sussman, in her capacity as Trustee of the Sussman Family Trust

Sworn and subscribed before me by SARAH K. SUSSMAN, who is _____ personally known to me, or produced *Fl. Driver Lic* as identification, on this 13 day of *Sept* 2017.

Notary Public
My commission expires:



DARLENE KOVALICK
Notary Public, State of Florida
Commission EE 832688
My comm. expires Sept. 29, 2020

**NOTICE OF HOMESTEAD. (Page 2 of 3)**

**TO:**

You are notified that the undersigned claims as homestead exempt from levy and execution under Section 4, Article X of the State Constitution the following described property:

> **ALL OF Lot 30 and the South 31 feet of Lot 29 of KENTEL PARK SUBDIVISION, as per map or plat thereof recorded in Plat Book 12 on Page 66 of the Public Records of Hillsborough County, Florida.**

The undersigned certifies, under oath, that she has applied for and received the homestead tax exemption as to the above described property, that 115716-0000 is the Folio Identification Parcel Number of this property, and that the undersigned has resided on this property continuously and uninterruptedly from June 2012 to the date of this Notice of Homestead.

The undersigned certifies, under oath, that the *lis pendens* filed by you, in derogation of *Fla.Stat. 817.535*, on 10 April 2014 as Instrument Number 2014123418 and recorded in Official Records Book 22518, Pages 1056-1057, of the Public Records of Hillsborough County, State of Florida, does not constitute a valid *lis pendens* on the described property.

YOU ARE FURTHER NOTIFIED, PURSUANT TO SECTION 222.01 ET SEQ., FLORIDA STATUTES, THAT WITHIN 45 DAYS AFTER THE MAILING OF THIS NOTICE YOU MUST FILE AN ACTION IN THE CIRCUIT COURT OF HILLSBOROUGH COUNTY, FLORIDA FOR A DECLARATORY JUDGMENT TO DETERMINE THE CONSTITUTIONAL HOMESTEAD STATUS OF THE SUBJECT PROPERTY OR TO FORECLOSE YOUR JUDGMENT LIEN ON THE PROPERTY AND RECORD A LIS PENDENS IN THE PUBLIC RECORDS OF THE COUNTY WHERE THE HOMESTEAD IS LOCATED. YOUR FAILURE TO SO ACT WILL RESULT IN ANY BUYER OR LENDER, OR HIS OR HER SUCCESSORS AND ASSIGNS, TO TAKE FREE AND CLEAR OF ANY JUDGMENT LIEN YOU MAY HAVE ON THE PROPERTY.

THIS IS NOT A CERTIFIED COPY

**NOTICE OF HOMESTEAD (Page 3 of 3)**

_Sarah S._

Signature of Sarah K. Sussman, in her capacity as Trustee of the Sussman Family Trust

_Sarah K Sussman_

Printed Name of Sarah K. Sussman, in her capacity as Trustee of the Sussman Family Trust

_119 S Clark_

Address of Sarah K. Sussman, in her capacity as Trustee of the Sussman Family Trust

Sworn and subscribed before me by SARAH K. SUSSMAN, who is ____ personally known to me, or produced  _Fl Driver Lic_ as identification, on this _13_ day of _Sept_, 2017.

_Darlene Kovalick_

Notary Public

My commission expires:

DARLENE KOVALICK
Notary Public, State of Florida
Commission# EE 832688
My comm. expires Sept. 29, 2020